[ORAL ARGUMENT NOT YET SCHEDULED]

**No. 23-5140**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

CITIZENS FOR CONSTITUTIONAL INTEGRITY,

*Plaintiff-Appellant,*

v.

THE CENSUS BUREAU, *et al.*,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the District of Columbia
No. 1:21-cv-3045-CJN-JRW-FYP
Then Honorable Judges Justin R. Walker, Florence Y. Pan, and
Carl J. Nichols

---

**PLAINTIFF-APPELLANT'S BRIEF**

---

JARED S. PETTINATO
THE PETTINATO FIRM
3416 13th St. NW, #1
Washington, DC 20010
(406) 314-3247
Jared@JaredPettinato.com
*Attorney for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1, Citizens for Constitutional Integrity (Citizens) state that the entity has no stock. The incorporators organized it as a Montana nonprofit corporation, and the IRS recognizes it as a 501(c)(3) charitable corporation. Therefore, no corporation owns 10% or more of its stock. As Circuit Rule 26.1(b) requires, Citizens state that, among the organization's purposes, Citizens seek to improve democratic elections.

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## I. Parties and Amici

Plaintiff-Appellant (Citizens):

- Citizens for Constitutional Integrity.

Defendants-Appellees (collectively, the Census Bureau):

- The Census Bureau;

- The Department of Commerce;

- Gina Raimondo, Secretary of Commerce, in her official capacity; and

- Robert Santos, Census Bureau Director, in his official capacity.

No amici or intervenors appeared before the district court.

## II. Rulings Under Review

Citizens seek review of the district court's Memorandum Opinion, App-151, and Order, App-150. The opinion and order granted the Census Bureau's motion to dismiss. They also denied as moot Citizens' renewed motion for summary judgment and the Census Bureau's motion in limine.

## III. Related Cases

Citizens are not aware of any related cases.

# TABLE OF CONTENTS

Corporate Disclosure Statement.................................................................ii

Certificate as to Parties, Rulings, and Related Cases............................ iii

   I. Parties and Amici....................................................................... iii

   II. Rulings Under Review ............................................................. iii

   III. Related Cases ........................................................................ iii

Table of Contents .....................................................................................iv

Table of Authorities.................................................................................vii

Glossary ...................................................................................................xii

Statement of Jurisdiction............................................................................1

Statement of the Issues...............................................................................2

Statement of the Case ................................................................................3

   I. Introduction...............................................................................3

   II. Legal Background ....................................................................5

      A. In the Fourteenth Amendment, Section 2, the Framers
      intended a fundamental change to apportioning seats......................5

      B. The Framers carefully crafted the Amendment's equation to
      encourage states to implement universal suffrage. ..........................12

         1. Every ten years, the Census Bureau counts United States
         inhabitants and apportions U.S. House of Representative seats. 12

         2. Insufficient data initially prevented Congress from
         implementing the Amendment. ....................................................14

      C. Congress passed several statutes that expanded standing to
      bring this lawsuit...............................................................................15

         1. No legal barriers that impeded litigation over the Amendment
         still stand...................................................................................15

         2. The Administrative Procedure Act expanded judicial review...18

         3. Section 209 expanded judicial review. ......................................19

         4. The Mandamus Act acts as a backstop if no other remedies are
         available. ...................................................................................20

III. Factual Background ...........................................................21

IV. Procedural Background ....................................................23

Standard of Review ................................................................25

Summary of Argument...........................................................26

Argument.................................................................................29

I. Citizens demonstrated the Report caused them concrete, vote-dilution injury. ......................................................................32

II. The Report caused that vote-dilution injury.....................36

III. Citizens proved redressability because a new Report could remedy their injuries. .........................................................38

A. The Report aggrieved Citizens by causing vote-dilution injury...40

B. Citizens' injuries bring them within the zone-of-interests for several provisions. ..........................................................42

C. Because Citizens meet the zone-of-interests test, they have procedural rights that make redressability easier to prove. ..........47

1. Plaintiffs can establish procedural rights without showing a right to participate in the illegally completed procedure.............51

2. Citizens sought relief that can redress their injuries. .............58

a. Remand or a writ of mandamus would redress Citizens' injuries.................................................................60

b. Vacatur would redress Citizens' injuries.................................67

c. Declaratory and injunctive relief would redress Citizens' injuries.................................................................68

Conclusion ..............................................................................69

Certificate of Compliance with Type-Volume Limit, Typeface Requirements, and Type-Style Requirements.......................70

Certificate of Service .............................................................71

Addendum ...............................................................................72

I. The 14th Amendment, Section 2 states:...........................72

II. 2 U.S.C. § 2a states:.........................................................72

III. 2 U.S.C. § 2b states: ....................................................................74

IV. 13 U.S.C. § 141 states:..............................................................74

V. Section 209, Act of Nov. 26, 1997 § 209, Pub. L. No. 105-119, 111 Stat. 2440, 2481 (codified at 13 U.S.C. § 141 note), states:.................77

VI. 5 U.S.C. § 702 states: ...............................................................82

VII. 5 U.S.C. § 706 states: ..............................................................82

# TABLE OF AUTHORITIES

## Cases

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967) .................................. 18, 40

*Action on Smoking and Health v. C.A.B*, 713 F.2d 795 (D.C. Cir. 1983)........................................................................................67

*Allen v. Milligan*, No. 21-1086 (2023) .................................................17

*Baker v. Carr*, 369 U.S. 186 (1962) ........................................ 17, 31, 59

*Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296 (2017)........... 40, 46

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................25

*Bennett v. Spear*, 520 U.S. 154 (1997).....................................................67

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) .......................................40

*Breedlove v. Suttles*, 302 U.S. 277 (1937) ..............................................10

*City of Boerne v. Flores*, 521 U.S. 507 (1997)........................................49

*Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388 (1987)...................... 42, 43, 45

*Cohens v. Virginia*, 19 U.S. 264 (1821) ............................................26, 43

*Colegrove v. Green*, 328 U.S. 549 (1946) ...............................................16

*Correctional Servs. Corp. v. Malesko*, 534 U.S. 61 (2001) .....................69

*Crouse-Hinds Co. v. InterNorth, Inc.*, 634 F.2d 690 (2d Cir. 1980)........53

*Data Processing Serv. v. Camp*, 397 U.S. 150 (1970) ....................... 41, 44

*Dep't of Commerce v. Montana*, 503 U.S. 442 (1992)...... 12, 13, 31, 38, 50

*Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999) ................................................................... 33, 35, 46

*Dep't of Educ. v. Brown*, No. 22-535 (June 30, 2023) .............................5

*Dickinson v. Zurko*, 527 U.S. 150 (1999) ................................................18

*Dist. of Columbia v. Heller*, 554 U.S. 570 (2008)...................................16

*Duke Power Co. v. Carolina Env. Study Grp.*, 438 U.S. 59 (1978)... 36, 59

*Dupree v. Younger*, No. 22-210 (May 25, 2023) .......................................1

*Evenwel v. Abbott*, 136 S. Ct. 1120 (2016) ...................................... 10, 12

*FEC v. Akins*, 524 U.S. 11 (1998)......................................... 30, 34, 40, 67

*FEC v. Ted Cruz for Senate*, 142 S. Ct. 1638 (2022)........................ 36, 68

*Fla. Power Light Co. v. Lorion*, 470 U.S. 729 (1985) ..............................61

*Frank v. Walker*, 17 F. Supp. 3d 837 (E.D. Wis. 2014), *overturned on other grounds by* 768 F.3d 745 (7th Cir. 2014), *r'hrg en banc denied*, 773 F.3d 783 (2014)........................................................... 22, 23

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) ........................ 19, 37, 68

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010)..................................................................................66

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ...........................................................................29

*Gill v. Whitford*, 138 S. Ct. 1916 (2018)...................................................34

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960) .............................................9

*Harper v. State Bd. of Elections*, 383 U.S. 663 (1966) ...........................10

*Info. Handling Servs., Inc. v. Def. Automated Printing*, 338 F.3d 1024 (D.C. Cir. 2003) ...........................................................25

*Int'l Bhd. of Teamsters v. Pena*, 17 F.3d 1478 (D.C. Cir. 1994)..48, 50, 58

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221 (1986) ..............................................16, 38, 46, 53, 54, 58

*Lampkin v. Connor*, 360 F.2d 505 (D.C. Cir. 1966) ....................3, 17, 18

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).........................................................42, 43, 44, 48

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ...............................32, 34, 39, 47, 48, 53, 54, 55, 60, 62

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990).................................48

*Marbury v. Madison*, 5 U.S. 137 (1803)...................................................20

*Massachusetts v. EPA*, 549 U.S. 497 (2006).......................................39, 60

*Match-E-Be-Nash-She-Wish Band of Indians v. Patchak*, 567 U.S. 209 (2012)..........................................................................44

*McClendon v. City of Albuquerque*, 630 F.3d 1288 (10th Cir. 2011)......52

*Nixon v. Herndon*, 273 U.S. 536 (1927) ..............................................9, 31

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004)...........................20

*Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n*, 896 F.3d 520 (D.C. Cir. 2018) ...............................................62, 63, 64

*Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935) ..............................50

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938 (2016) ........51

*Renal Physicians Ass'n v. U.S. Dep't of Health and Human Servs.*, 489 F.3d 1267 (D.C. Cir. 2007)..........................................................56

*Reynolds v. Sims*, 377 U.S. 533 (1964)...........................................17, 35

*Richardson v. Ramirez*, 418 U.S. 24 (1974) ..............................................3

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989).......55

*S. Carolina v. Katzenbach*, 383 U.S. 301 (1966).....................................8

*SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348 (2018) .....................................49

*Sharrow v. Brown*, 447 F.2d 94 (2d Cir. 1971) ...........................63, 64, 65

*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013)..........................................18

*St. Joseph Stock Yards Co. v. United States*, 298 U.S. 38 (1936)..........50

*Strycker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223
 (1980) ..................................................................................................62

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009)............ 26, 35, 52, 53

*Swann v. Adams*, 385 U.S. 440 (1967)..............................................64

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021)......................55, 56

*United States v. Denedo*, 556 U.S. 904 (2009) ...............................39, 61

*United States v. Logue*, 344 F.2d 290 (5th Cir. 1965)............................9

*United States v. SCRAP*, 412 U.S. 669 (1973) ....................................35

*Utah v. Evans*, 536 U.S. 452 (2002) ......................... 19, 33, 36, 46, 60, 69

*Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021) ..............................59

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765 (2000).......39

*Warth v. Seldin*, 422 U.S. 490 (1975)..............................................25, 29

*Webster v. Doe*, 486 U.S. 592 (1988)...................................................18

*Wesberry v. Sanders*, 376 U.S. 1 (1964) ............................................4, 44

*WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013) ...........42

*Wong Yang Sung v. McGrath*, 339 U.S. 33 (1950)...............................18

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886).............................................35

*Zivotofsky v. Clinton*, 566 U.S. 189 (2012)..........................................31

## Statutes

13 U.S.C. § 141 ....................................2, 5, 12, 13, 28, 36, 44, 45, 49, 58

15 U.S.C. § 1681e ..............................................................................55

2 U.S.C. § 2a ...............................................................................13, 36

2 U.S.C. § 2b .....................................................................................36

2 U.S.C. § 6 .......................................................................................15

28 U.S.C. § 1291 .................................................................................1

28 U.S.C. § 1331 .................................................................................1

28 U.S.C. § 1361 .................................................................................1

28 U.S.C. § 1631 ...............................................................................20

5 U.S.C. § 702 ..............................4, 27, 38, 39, 40, 41, 42, 43, 46, 51, 54

5 U.S.C. § 706 .....................................................................19, 40, 67

Act of Feb. 2, 1872, 17 Stat. 28 ..........................................................15

Act of Nov. 15, 1941, § 1, 55 Stat. 761-762 (codified at 2 U.S.C. §
 2a) .....................................................................................................13

Act of Nov. 26, 1997 § 209, Pub. L. No. 105-119, 111 Stat. 2440,
    2481 (codified at 13 U.S.C. § 141
    note) ................................ 5, 19, 27, 28, 38, 40, 41, 42, 44, 46, 47, 49, 58
Administrative Procedure Act, 5 U.S.C. §§ 701-
    706 ............................................................... 4, 16, 19, 23, 40, 42, 60
Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437 (Aug.
    6, 1965) ............................................................................................ 18

## Other Authorities

13B Charles Alan Wright & Arthur R. Miller, Fed. Practice &
    Proc. (3d ed. 2008) .......................................................................... 29
Arthur Earl Bonfield, *Right to Vote and Judicial Enforcement of
    Section Two of the Fourteenth Amendment*, 46 Cornell L. Rev.
    108 (1960) ........................................................................................ 49
Br. for the Appellants, *Trump v. New York*, No. 20-366 (Oct. 30,
    2020) ................................................................................................ 14
Census Bureau, Table B1, Top Ten Runner-Up States to Almost
    Gain Another Congressional Seat: 2020 Census Bureau, Table
    B1, Top Ten Runner-Up States to Almost Gain Another
    Congressional Seat: 2020 Census (2021) ........................................ 62
Cong. Globe, 39th Cong., 1st Sess. (1866) ........... 6, 7, 8, 9, 11, 12, 14, 45
Cong. Globe, 42nd Cong., 2nd Sess. (1872) ........................................ 15
H.R. Rep. No. 41-3 (1870) .............................................................. 14, 15
J. COOLEY, A PRIMER OF FORMAL LOGIC (1942) ..................................... 53
Merrick B. Garland, Policy Address Regarding Voting Rights
    (June 11, 2021) ................................................................................ 32
Pamela S. Karlan, *All Over the Map: The Supreme Court's Voting
    Rights Trilogy*, 1993 Sup. Ct. Rev. 245 (1993) .............................. 30, 31
President Joe Biden, Remarks on Protecting the Sacred,
    Constitutional Right to Vote (July 13, 2021) .................................... 9
Report of the Joint Committee on Reconstruction, H.R. Rep. No.
    30, 39th Cong., 1st Sess. (1866); Sen. Rep. No. 112, 39th Cong.,
    1st Sess. (1866) .................................................................... 6, 9, 11, 45
RUGGERO J. ALDISERT, LOGIC FOR LAWYERS (3d ed. 1997) ..................... 53
THE FEDERALIST No. 39 (Random House, Inc. 2000) (Madison) .............. 7
Tr. 35, *United States v. Texas*, No. 22-58 (2023 (Roberts, C.J.)
    (Nov. 29, 2022) ................................................................................ 68

Zechariah Chafee, Jr., *Congressional Reapportionment*, 42 Harv. L. Rev. 1015 (1929) ............................................................................. 16

## Rules

Circuit Rule 26.1 ............................................................................... ii
Federal Rule of Appellate Procedure 26 ........................................... 1
Federal Rule of Appellate Procedure 26.1 ....................................... ii
Federal Rule of Appellate Procedure 4 ............................................. 1
Federal Rule of Civil Procedure 56 ................................................. 24
Federal Rule of Civil Procedure 8 ................................................... 65

## Constitutional Provisions

U.S. Const. amend. 1 ................................................................... 4, 50
U.S. Const. amend. 13 ........................................................... 5, 6, 8, 12
U.S. Const. amend. 14, sec. 2 2, 3, 4, 5, 7, 9, 10, 11, 12, 14, 15, 16, 17, 21, 22, 23, 24, 27, 28, 30, 31, 38, 40, 41, 42, 44, 45, 46, 47, 49, 50, 58, 61, 63, 64, 65, 66, 69
U.S. Const. amend. 19 ..................................................................... 10
U.S. Const. amend. 26 ..................................................................... 10
U.S. Const. amend. 4 ......................................................................... 4
U.S. Const. amend. 5 ......................................................................... 4
U.S. Const. art. I .................................................. 5, 27, 44, 45, 46, 47, 49
U.S. Const. art. I, sec. 2, cl. 3 .......................................................... 2
U.S. Const. art. III .................... 4, 5, 25, 29, 32, 39, 40, 47, 56, 61, 66, 69

# GLOSSARY

| | |
|---|---|
| The Amendment | The 14th Amendment, Section 2 |
| APA | The Administrative Procedure Act, 5 U.S.C. §§ 701-706 |
| The Census Bureau | Federal Defendants the Census Bureau, the U.S. Department of Commerce, the Secretary of Commerce, and the Director of the Census Bureau |
| Citizens | Citizens for Constitutional Integrity |
| CGXXX | Cong. Globe, 39th Cong., 1st Sess. XXX (1866) |
| NEPA | The National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 to 4370m-12 |
| Reconstruction Report | Report of the Joint Committee on Reconstruction XIII, H.R. Rep. No. 30, 39th Cong., 1st Sess. (1866); Sen. Rep. No. 112, 39th Cong., 1st Sess. (1866) |
| Report | The Secretary of Commerce's 2021 report on apportionment to the President under 13 U.S.C. § 141(b), App-165 |
| Section 209 | Act of Nov. 26, 1997 § 209, Pub. L. No. 105-119, 111 Stat. 2440, 2481 (codified at 13 U.S.C. § 141 note) |

## STATEMENT OF JURISDICTION

The district court had jurisdiction because (a) Citizens claim federal officers and agencies violated federal law and the United States Constitution—namely Federal Defendants the Census Bureau, the U.S. Department of Commerce, the Secretary of Commerce, and the Director of the Census Bureau (collectively, the Census Bureau)—and (b) Citizens sought mandamus. *See* App-128 to -129; 28 U.S.C. §§ 1331, 1361. This Court has jurisdiction over this appeal because the April 18, 2022, order, App-150, qualifies as a final order, and the April 18, 2022, Memorandum Opinion, App-151, merges into it. *See* 28 U.S.C. § 1291; *Dupree v. Younger*, No. 22-210, Slip Op. 5, 7 (May 25, 2023).

Citizens appealed on time. In cases with United States agencies and officers as parties, Federal Rule of Appellate Procedure 4(a)(1)(B) sets the notice of appeal due within sixty days. The sixtieth day fell on Saturday, June 17, 2023, so Federal Rule of Appellate Procedure 26(a)(1)(C) extended the deadline to Monday, June 19. Citizens filed their notice of appeal that day. App-163.

## STATEMENT OF THE ISSUES

The 14th Amendment, Section 2 (the Amendment), replaced the Constitution's original method for distributing seats in the U.S. House of Representatives, based on "free Persons" and "three fifths of all other Persons." Art. I, sec. 2, cl. 3. The Amendment requires the United States to apportion seats based on the proportion of each state's citizens who can vote (whose "right to vote" was not "denied" or "in any way abridged," with exceptions). The Secretary of Commerce's 2021 report on apportionment to the President under 13 U.S.C. § 141(b) (the Report), App-165, however, ignored that procedure.

The questions presented are:

1. Whether Citizens demonstrated Article III standing by vote-dilution injury when their members' states lost seats.

2. Whether the Report caused Article III injury when its text allotted one fewer seat to two of Citizens' members' states.

3. Whether remand, mandamus, vacatur, declaratory relief, or injunctive relief would redress Citizens' procedural right for the Census Bureau to comply with the Amendment before issuing the Report, although plaintiffs had no right to participate in the Report procedure.

2

**STATEMENT OF THE CASE**

## I. Introduction

The Census Bureau admitted that, when it issued the Report, it did not complete the Amendment procedure that the Constitution requires. App-11. The Amendment requires the Census Bureau (1) to calculate each states' denials and abridgments of their citizens' rights to vote (with exceptions) and (2) to discount those states' populations proportionately when apportioning seats in the U.S. House of Representatives among the states. Citizens filed a conventional administrative law case to force the Census Bureau to comply with the Amendment.

The Supreme Court called the Fourteenth Amendment, Section 2, "as much a part of the [Fourteenth] Amendment as any of the other sections," and "what it means" is "important." *Richardson v. Ramirez*, 418 U.S. 24, 55 (1974). This Court has rejected efforts to "disparage the seriousness of the questions" arising under the Amendment, and it planned to allow plaintiffs to bring claims under it. *Lampkin v. Connor*, 360 F.2d 505, 510, 512 (D.C. Cir. 1966). Congress did not pass the Fourteenth Amendment, Section 2, as some midnight, hasty regulation. The Fourteenth Amendment passed the phalanx of Article V to find its

place among the First Amendment, the Fourth Amendment, the Fifth Amendment, and the other Fourteenth Amendment rights that this Court enforces every day. The Constitution assigns this Court a duty to give effect to every provision, and that includes the Fourteenth Amendment, Section 2.

For sixty years, courts have routinely recognized Article III standing for federal malapportionment claims. *See Wesberry v. Sanders*, 376 U.S. 1, 5-7 (1964). Yet the district court invented a new standing requirement. It dismissed this case because, it held, Citizens had no right to participate in the Report procedure, and they failed to prove remand would certainly give new seats to New York and Pennsylvania, where Citizens' members live. Article III, however, requires no participation to assert a procedural right.

In the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, Congress used its constitutional power to expand Article III standing. Plaintiffs need only show an agency action aggrieved them and they stand arguably in the zone of interests for the statutes whose enforcement they seek. 5 U.S.C. § 702. By taking seats away from Citizens' members' states, the Report aggrieved them within the zone-

of-interests of the U.S. Constitution Article I, the Amendment, 13 U.S.C. § 141(b), and Section 209. *See* Act of Nov. 26, 1997 § 209, Pub. L. No. 105-119, 111 Stat. 2440, 2481 (codified at 13 U.S.C. § 141 note) (Section 209). By the same zone-of-interests test, Citizens established their procedural right to the Amendment procedure. Their procedural right means Citizens can establish redressability even if the outcome is uncertain. *See Dep't of Educ. v. Brown*, No. 22-535, Slip Op. *3, 11, 15 (June 30, 2023). Thus, the district court could redress Citizens' injuries by remand, mandamus, vacatur of the Report, a declaration it is illegal, or an injunction.

Citizens suffered vote-dilution injuries; the Report caused the injuries; and Citizens request relief that can redress those injuries. Citizens satisfied Article III, and the Constitution compels reversal and remand for further proceedings.

## II. Legal Background

A. <u>In the Fourteenth Amendment, Section 2, the Framers intended a fundamental change to apportioning seats.</u>

After the Civil War, the Framers saw that the Thirteenth Amendment, which outlawed slavery, perversely rewarded rebel states for the Civil War by increasing their number of seats in the House of

Representatives. Report of the Joint Committee on Reconstruction XIII (Reconstruction Report), H.R. Rep. No. 30, 39th Cong., 1st Sess. (1866); Sen. Rep. No. 112, 39th Cong., 1st Sess. (1866). Before the Civil War, enslaved persons counted as three-fifths of a person; after the Civil War, those newly free persons counted as five-fifths of a person—and the Framers knew those rebel states would not let the newly freed people vote. *Id.*; *see* U.S. CONST. art. I, sec. 2. By freeing 3.6 million people in the rebel states, the Thirteenth Amendment would have given the rebel states' leaders about thirteen additional seats without giving any formerly enslaved person a voice in their government. *See* Cong. Globe, 39th Cong., 1st Sess. 74, 2767 (1866) (hereinafter "CGX" in which X denotes the page number).

Emerging from a devastating and bloody Civil War, the Framers of the Second Founding made a "fundamental" shift in apportioning seats in the U.S. House of Representatives. Reconstruction Report XIII. The Framers felt a heavy responsibility. "Never before in the history of nations has a legislative body met charged with such duties and obligations as have been imposed upon us. We are legislating for the present and the future." CG781. The Framers pursued universal

suffrage because they shared James Madison's faith in the "capacity of mankind for self-government." THE FEDERALIST No. 39, 240 (Random House, Inc. 2000); CG2459. "The point is that the person who is bound by the laws in a free Government ought to have a voice in making them. It is the very essence of republican government." CG2767.

The Framers designated state actions as the "mischief we are aiming at." CG385. Specifically, they aimed to stop states from "go[ing] on, in great measure, as heretofore, excluding their people from suffrage and yet having them counted in the basis of their representation." *Id.* The Framers wrote the Amendment so "that no considerable body of the people in any State can be disfranchised, *no matter on what account*, and still be numbered in her basis of representation." *Id.* (emphasis added), 2767.

The Framers anticipated states preventing voters from voting by clever administrative qualifications, like property, faith, intelligence, ignorance, reading and writing, and "other disqualifying tests." *Id.* at 385, 407, 410, 2767. They left no loophole. Senator Charles Sumner led opposition to an earlier version as too ambiguous: "There are tricks and evasions possible, and the cunning slave-master will drive his coach and

six through your amendment stuffed with all his representatives."
CG647.

History confirms the Framers' cynicism as states innovated beyond
the Framers' wildest imaginings. Since the Civil War, states used voter
registration requirements to deny citizens their rights to vote. *See S.
Carolina v. Katzenbach*, 383 U.S. 301, 311 (1966). They used property
requirements and grandfather clauses, which allowed registration only
if the voter's grandfather voted (before Thirteenth Amendment
ratification). *Id.* States required registrants to interpret documents. *Id.*
They leveraged election officials' discretion to discriminate against
racial minorities. *Id.* at 312. Election officials excused white registration
applicants, gave them, "easy versions" of literacy tests, or outright
helped them. *Id.* Some states required "good morals," which presented a
standard "so vague and subjective that it ha[d] constituted an open
invitation to abuse at the hands of voting officials." *Id.* at 312-13.

The Framers never conceived of states discriminating based on race
at the primary stage, or by gerrymandering city boundaries to cut out
black voters, or by prohibiting a new voter from registering until
another, already registered, white voter vouched for the new voter's

qualifications. *See Gomillion v. Lightfoot*, 364 U.S. 339, 340 (1960); *Nixon v. Herndon*, 273 U.S. 536, 540 (1927); *United States v. Logue*, 344 F.2d 290 (5th Cir. 1965). No matter. In the Amendment, the Framers cast the broadest net to catch every clever trick or evasion: count the citizens who can vote; that catches every denial. CG436, 2767.

Voting denials and abridgments continue. Two years ago, President Joe Biden recognized, "we are facing the most significant test of our democracy since the Civil War." Remarks on Protecting the Sacred, Constitutional Right to Vote (July 13, 2021).[1] There, the President was referring to new laws in seventeen states that make voting harder.

The Framers left states free to adopt any manner of voting rights laws. CG2459, 2767. But if they do not extend universal suffrage to citizens eighteen years old or older (except for rebels and criminals), the Amendment reduces their representation in the U.S. House of Representatives.[2] As a policy, the Framers considered that result "eminently just and proper." Reconstruction Report XIII.

---

[1] https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/07/13/remarks-by-president-biden-on-protecting-the-sacred-constitutional-right-to-vote.

[2] It states:

The Framers wrote this equation into the Amendment (as amended

by the Nineteenth and Twenty-Sixth Amendments):

$$\frac{\text{Basis of representation}}{\text{Residents}} = \frac{\begin{array}{c}\text{Citizens eighteen years old or older who can vote}\\\text{+ citizens who cannot vote because of}\\\text{rebellion paticipation or criminal conviction}\\\text{(no penalty for disenfranchising those citizens)}\end{array}}{\text{Citizens at least eighteen years old}}$$

This equation replaced the equation the original Framers wrote, as part

of the Great Compromise, to apportion seats based on "the whole

Number of free Persons . . . and . . . three fifths of all other Persons."

---

Representatives shall be apportioned among the several States
according to their respective numbers, counting the whole number
of persons in each State, excluding Indians not taxed. But when
the right to vote at any election for the choice of electors for
President and Vice President of the United States,
Representatives in Congress, the Executive and Judicial officers of
a State, or the members of the Legislature thereof, is denied to
any of the male inhabitants of such State, being twenty-one years
of age, and citizens of the United States, or in any way abridged,
except for participation in rebellion, or other crime, the basis of
representation therein shall be reduced in the proportion which
the number of such male citizens shall bear to the whole number
of male citizens twenty-one years of age in such State.
The Nineteenth and Twenty-Sixth Amendments, respectively, deleted
"male" and replaced "twenty-one" with "eighteen." *See Evenwel v.
Abbott*, 136 S. Ct. 1120, 1149 n.7 (2016) (Alito, J., concurring); *see also
Breedlove v. Suttles*, 302 U.S. 277, 283 (1937), *overruled on other
grounds by Harper v. State Bd. of Elections*, 383 U.S. 663, 668-69
(1966).

U.S. CONST. art. 1, sec. 2. With the Amendment, the Framers sought "to change the basis of representation among the States . . . ." CG74; CG356; CG1622. They amended Article I, Section 2.

Take 1870 North Carolina. Its population split roughly into two-thirds white people and one-third black people. *See* App-15 to -16 (391,650/1,071,361 = 0.36). Immediately after the Civil War, North Carolina did not allow black citizens to vote. *See* Reconstruction Report, Virginia, North Carolina, South Carolina 174. Assume for simplicity the census reflected citizens and North Carolina did not disenfranchise anyone for criminal convictions or rebellion. Then, the Amendment would have required the Census Bureau to count only two-thirds of North Carolina's enumerated population when apportioning seats.

The district court in this case provided a second example. It proposed a state with 100 inhabitants and with 80 citizen-residents over the age of 21. App-153. Suppose the state denied or abridged the rights to vote of 8 citizens (10 percent) for reasons other than participation in rebellion or another crime. *See id.* Then, the Amendment would require the Census Bureau to reduce the state's basis of representation by 10 percent from 100 to 90 when apportioning seats. *See id.*

B. <u>The Framers carefully crafted the Amendment's equation to encourage states to implement universal suffrage.</u>

Joint Committee Co-Chair Thaddeus Stevens called Section 2 "the most important in the [proposed Fourteenth Amendment]." CG2459. He expected it would either "compel the States to grant universal suffrage or so to shear them of their power as to keep them forever in a hopeless minority in the national Government . . . ." *Id.*; *Evenwel*, 136 S. Ct. at 1140 (Thomas, J., concurring) ("The Fourteenth Amendment pressured States to adopt universal male suffrage by reducing a noncomplying State's representation in Congress. Amdt. 14, § 2."). Nonetheless, early execution proved difficult. Now, however, the Census Bureau has voluminous tools to implement the Amendment.

*1. Every ten years, the Census Bureau counts United States inhabitants and apportions U.S. House of Representative seats.*

Of course, a state's population initially determines its representation in the U.S. House of Representatives. The Constitution requires the United States to count inhabitants every ten years, via an "actual Enumeration" in "such Manner as" Congress directs, and to apportion seats so each state receives "at Least one Representative." Art. I, sec. 2, cl. 3; 13 U.S.C. § 141(a); *Dep't of Commerce v. Montana*, 503 U.S. 442, 452 n.25 (1992). Among fifty states, 435 Representatives never divide

12

evenly. Every method for apportioning seats leaves states larger or smaller remainders of populations without equal representation. *Montana*, 503 U.S. at 452 ("the fractional remainder problem"). Depending on the method for handling remainders, some states win, and some states lose. *See id.*

For about 130 years, Congress manually apportioned seats after each census. *Id.* at 448-51. That system broke down in the 1920 census, when Congress failed to pass a statute. *Id.* at 451-52. Congress responded by delegating apportionment responsibility to the Census Bureau, so Congress need not act. *Id.* at 451, 452 n.25. In 1941, it codified the method of equal proportions for apportioning seats. *Id.* at 451-52; Act of Nov. 15, 1941, § 1, 55 Stat. 761-762 (codified at 2 U.S.C. § 2a).

Congress requires the Census Bureau to report to the President "[t]he tabulation of total population by States . . . as required for the apportionment of Representatives in Congress among the several States." 13 U.S.C. § 141(b). After receiving that report, the statute requires the President to send Congress a statement that relays the results of the census and apportionment. 2 U.S.C. § 2a. The Executive Branch recognizes the President's role as a "ministerial" duty. Br. for

the Appellants 3, *Trump v. New York*, No. 20-366 (Oct. 30, 2020). The Census Bureau issued the Report under these statutes.

### 2. Insufficient data initially prevented Congress from implementing the Amendment.

The Framers anticipated difficulties when census-takers sought to determine whose voting rights a state denied or abridged. *See* CG10, 2943, 3038-39. Senator Jacob Howard cautioned that the agency could find the task "impossible" and warned the Amendment sets a standard "so uncertain" and "so difficult of practical application" that it risks the census results becoming "so inaccurate and unreliable as to be next to worthless." *Id.* at 3038-39. For the technologies and capabilities of the 1870 census, those difficulties indeed proved insurmountable.

Then-Representative James Garfield spearheaded the House of Representatives' Committee on the Ninth Census's oversight of the 1870 census. H.R. Rep. No. 41-3 (1870). The Committee recognized broad voting-right denials that would qualify under the Amendment, but "could devise no better way" to gather those statistics than by adding a "difficult" question to the census questionnaire. *See id.* at 53.

The 1870 census questionnaire asked respondents the number of "Male citizens of the United States, 21 years of age, whose right to vote

is denied or abridged on other grounds than rebellion or other crime."
*Id.* at 53, 66. The Committee knew it would "be difficult to get true and
accurate answers." *Id.* To no one's surprise, that approach did not work.

The Census Board received a poor response. Of the 38 million United
States inhabitants it counted, only about 43 thousand male citizens
over twenty-one years old reported a state denying or abridging their
rights to vote. Cong. Globe, 42nd Cong., 2nd Sess. 609-10 (1872).

No one trusted those numbers. One representative complained, "this
whole table is utterly inaccurate; it is not reliable; it is not made in
pursuance of any law; it is without weight." *Id.* at 79. Seeing the
statistics "confessedly unreliable" to implement the Amendment,
Congress implemented 2 U.S.C. § 6 to ensure that a state's
representatives "shall be reduced" upon the basis of the Amendment.
Act of Feb. 2, 1872, 17 Stat. 28; Cong. Globe, 42nd Cong., 2nd Sess. 670.

C. Congress passed several statutes that expanded standing to bring
this lawsuit.

1. *No legal barriers that impeded litigation over the Amendment
still stand.*

Although the Census Bureau lacked sufficient statistics in 1870, it
now has voluminous statistics. Supercomputers and sophisticated
databases allow the Census Bureau and states to compile voter data

with innumerable characteristics. It can use that expertise to implement the Amendment. This capacity and the availability of this legal challenge developed over time. For the Amendment, as in other circumstances, "[i]t should be unsurprising that such a significant matter has been for so long judicially unresolved." *Dist. of Columbia v. Heller*, 554 U.S. 570, 625 (2008) (collecting examples).

Until 1929, Congress apportioned seats directly, so likely no lawsuit could have enforced the Amendment against Congress. *See* Zechariah Chafee, Jr., *Congressional Reapportionment*, 42 Harv. L. Rev. 1015, 1018 (1929). When Congress delegated authority to the Census Bureau in 1929, plaintiffs had no cause of action against the Census Bureau. Not until 1946 did the APA give plaintiffs broad access to courts to claim agency decisions violated the law. *See* Pub. L. No. 79-404, 60 Stat. 237 (June 11, 1946); *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 n.4 (1986). That same year, however, the Supreme Court dismissed an apportionment case based on the political question doctrine. *Colegrove v. Green*, 328 U.S. 549 (1946).

That principle, that apportionment presented a political question, controlled for sixteen years until the Supreme Court crossed the

16

Rubicon on malapportionment. In the landmark decision of *Baker v. Carr*, 369 U.S. 186 (1962), it batted down multitudinous objections and confirmed its jurisdiction over malapportionment claims. The Supreme Court knew exactly the momentous step it was taking. "We are cautioned about the dangers of entering into political thickets and mathematical quagmires. Our answer is this: a denial of constitutionally protected rights demands judicial protection; our oath and our office require no less of us." *Reynolds v. Sims*, 377 U.S. 533, 566 (1964). Today, courts routinely address malapportionment claims. *See*, *e.g.*, *Allen v. Milligan*, No. 21-1086 (2023) (applying the 15th Amendment).

When the NAACP LDF brought a claim for declaratory relief under the Amendment in the 1960s, this Court deferred declaratory relief until it could see the results of the brand-new Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437 (Aug. 6, 1965). *Lampkin*, 360 F.2d at 509, 511 (1966). This Court recognized "the seriousness of the questions presented" and expressed skepticism of arguments that the Amendment "does not mean what it appears to say." *Id.* at 512. Although it was "under no illusions" about existing voting

17

discrimination, it deferred declaratory relief until it could see the

Voting Rights Act's "final impact." *Id.* at 511. If "discrimination

persist[ed]," this Court planned to "open the door to judicial relief . . . ."

*Id.* Since the last census, the Supreme Court recognized that, despite

the Voting Rights Act, "voting discrimination still exists; no one doubts

that." *Shelby Cnty. v. Holder*, 570 U.S. 529, 536 (2013). Citizens claim

the completed census is illegal, so the harms are happening now.

Consequently, *Lampkin* directs standing and opening the door to

judicial relief.

   *2. The Administrative Procedure Act expanded judicial review.*

   Congress passed the APA as "to bring uniformity to a field full of

variation and diversity." *Dickinson v. Zurko*, 527 U.S. 150, 155 (1999).

Therefore, the APA enacted "generous" and "comprehensive provisions"

for judicial review. *Webster v. Doe*, 486 U.S. 592, 599 (1988); *Abbott

Labs. v. Gardner*, 387 U.S. 136 (1967). Congress passed the APA after

"a long period of study and strife; it settles long-continued and hard-

fought contentions, and enacts a formula upon which opposing social

and political forces have come to rest." *Wong Yang Sung v. McGrath*,

339 U.S. 33, 40 (1950). The Supreme Court directs courts "to give effect

to [the APA's] remedial purposes where the evils it was aimed at appear." *Id.* at 41.

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that qualify as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)-(C). It specifically includes a procedural right to claim an agency completed an action "without observance of *procedure required by law*." *Id.* § 706(2)(D) (emphasis added).

### 3. Section 209 expanded judicial review.

Congress passed Section 209 to expand citizens' rights to bring malapportionment claims. In *Franklin v. Massachusetts*, 505 U.S. 788 (1992), the Supreme Court had dismissed APA claims that the Secretary of Commerce illegally calculated an apportionment. Five years later with Section 209, Congress restored courts' abilities to review those determinations. It broadly opened the courts to claims that any census "counting method[]" was illegal. *See Utah v. Evans*, 536 U.S. 452, 463 (2002).

19

### 4. The Mandamus Act acts as a backstop if no other remedies are available.

Mandamus acts as a backstop when all other remedies fail. Known as the Mandamus Act, 28 U.S.C. § 1631 authorizes district courts, "in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." *Id.* Courts can issue writs of mandamus to direct an agency to act "without directing *how* it shall act." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (quotations omitted).

Blackstone defined a mandamus as "'a command issuing in the king's name from the court of king's bench, and directed to any *person . . . requiring them to do some particular thing therein specified, which appertains to their office and duty . . . .*'" *Marbury v. Madison*, 5 U.S. 137, 169-70 (1803) (quoting Commentaries 110 (3d ed.)). Chief Justice Marshall recognized a judicial duty to issue mandamus whenever "'there is a right to execute an office . . . (more especially if it be in a matter of public concern . . .) and a person is . . . dispossessed of such right, and has no other specific legal remedy . . . .'" *Id.* at 168-69.

### III. Factual Background

The Census Bureau compiles voter registration statistics sufficient to implement the Amendment. Yet it admitted it did not complete the analysis the Amendment required and disclaimed responsibility for completing the Amendment process. App-11.

Every two years as part of its current population survey, the Census Bureau collects voter registration data along with demographic and economic data to obtain "a better understanding of the social and demographic characteristics of American voters." App-22. In that survey, the Census Bureau produced, for each state, the numbers of citizens over eighteen years old and the percentage of those citizens whom the state had registered to vote. *Id.*; App-67. The Census Bureau released that November 2020 data in April 2021—just as it was completing its counts of resident populations for the decennial census. *Compare* App-21 *with* App-24.

Several events had occurred since the 2010 Census that disenfranchised otherwise-eligible voters. For example, Wisconsin's 2011, strict photo voter ID law disenfranchised 300,000 of its already registered voters. *Frank v. Walker*, 17 F. Supp. 3d 837, 842, 854, 884

(E.D. Wis. 2014), *overturned on other grounds by* 768 F.3d 745, 746 (7th Cir. 2014), *r'hrg en banc denied*, 773 F.3d 783, 785 (2014). Wisconsin accepts only nine forms of photo ID to prove voters' identities: (1) driver's license, (2) temporary driver's license, (3) state ID card, (4) temporary state ID card, (5) passport, (6) naturalization certificate, (7) tribal ID, (8) active-military ID, or (9) university ID. 17 F. Supp. 3d at 843. Expired IDs do not qualify. *Id.* After a two-week trial and an exhaustive analysis of expert reports, the district court counted 300,000 registered voters who lacked one of these IDs. *Id.* at 842, 854, 880-84.

Citizens engaged Data Scientist Ayush Sharma to calculate the effect of these denials and abridgments via the method of equal proportions. Data Scientist Sharma has two Master's Degrees: one in Statistics and Analytics, and one in Electrical and Computer Engineering. App-43 to -44. Relying on the Census Bureau's enumerated data, the Sentencing Project's expert report, and the *Frank* court's findings, he examined the impact of the Wisconsin law on apportionment in four scenarios. App-45 to -46. Data Scientist Sharma first confirmed his method reached the same results as the Census Bureau. App-46, -48. Then, he inserted the data into the Amendment's equation and calculated each states' bases

of representation, via the method of equal proportions, under three more scenarios. App-46 to -47. In Scenario 2, he calculated the percentage of citizens registered to vote in each state and reapportioned the 435 seats accordingly. App-46. In Scenario 3, he removed 300,000 voters from Wisconsin, based on *Frank*, and reapportioned the 435 seats. App-47. In Scenario 4, he calculated results based on both voter registration rates and the *Frank* court's findings. App-47. These scenarios showed additional seats moving to New York, Pennsylvania, and Virginia.

Citizens' members' declarations assert the 2020 Census harmed them by taking seats from their states. App-39; App-37; App-124.

## IV. Procedural Background

Citizens bring two claims. They claim the Census Bureau violated the APA when it issued the Report without completing the procedure in the Amendment. App-146 to -147. They also claim the Mandamus Act compels the court to direct the Census Bureau to complete the procedure the Amendment requires. App-147. Citizens seek remand, vacatur, declaratory relief, injunctive relief, and a deadline for completing the remand. App-148.

23

Citizens moved for summary judgment. App-6. The Census Bureau responded by moving to dismiss and *in limine* for delay under Federal Rule of Civil Procedure 56(d) to conduct discovery on Citizens' summary judgment motion. App-6 to -7.

The district court ultimately held that Citizens did not prove injury, although the Report removed seats from New York and Pennsylvania. App-156. It required Citizens to prove that a new report would give members' states additional seats. *Id.* It recognized the Census Bureau failed to implement the Amendment, but rejected Citizens' claim that they have a procedural right because Citizens had no right to participate in the Report procedure, and procedural rights "are *usually* found in statutory provisions that give private parties a right to participate in a government process." App-161 to -162 (emphasis added). It failed to determine whether any other situations give plaintiffs procedural rights.

The district court dismissed the case and denied the motions for summary judgment and *in limine* as moot. App-162.

24

## STANDARD OF REVIEW

This Court reviews de novo district court orders that dismiss cases for lack of standing. *Info. Handling Servs., Inc. v. Def. Automated Printing*, 338 F.3d 1024, 1029 (D.C. Cir. 2003) (Garland, J.). When assessing Article III standing, courts assume a plaintiff's claim succeeds on the merits. *Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal"). And in deciding motions to dismiss, courts assume plaintiffs are correct on the facts—even if the court doubts those facts. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) (recognizing that "a well-pleaded complaint may proceed even if it appears that a recovery is very remote and unlikely" (quotations omitted)). Therefore, this Court will assume Citizens are correct on the facts and their legal claims.

Substantively, Article III requires individual plaintiffs to demonstrate (1) injury in fact that is concrete, particularized, actual, imminent, and not conjectural or hypothetical, (2) that the injury is "fairly traceable to the challenged action of the defendant," and (3) that

25

it is "likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

Courts do not manufacture new standing requirements to evade difficult constitutional questions. Chief Justice John Marshall directed courts to answer constitutional questions despite doubts, complexities, or difficulties that may arise: "the judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution." *Cohens v. Virginia*, 19 U.S. 264, 404 (1821). Declining "the exercise of jurisdiction which is given . . . would be treason to the constitution." *Id.*

## SUMMARY OF ARGUMENT

Citizens proved concrete injury, proved the Report caused it, and proved that various types of relief they seek could redress their injury. Two of Citizens' members live in New York and Pennsylvania. Those states each have one fewer seat in the U.S. House of Representatives now than they had before the Report. Citizens' vote-dilution injury satisfies Article III.

The Report apportioned the seats, and it took one seat away from New York and Pennsylvania. New York had 27; now it has 26.

Pennsylvania had 18; now it has 17. The Report caused Citizens' vote-dilution injury.

Citizens demonstrated redressability by alleging they have a procedural right within the zone of interests of Article I, the Amendment, 13 U.S.C. § 141, and Section 209. If the Census Bureau completed the Amendment procedure, that procedure could redress Citizens' members' injuries.

Citizens demonstrated a procedural right. In 5 U.S.C. § 702, Congress allowed plaintiffs to claim agencies violated procedures if (1) the agency action "aggrieved" the plaintiffs (injured them in fact) and (2) the plaintiffs' injuries lie arguably within the zone of interests for the constitutional provision or statute they allege the agency violated. The Mandamus Act also accommodates claims based on procedural rights to compel agency action. *See* 28 U.S.C. § 1631.

Citizens' vote-dilution injuries prove the Report aggrieved them. Their injuries also bring them within the zone of interests of Article I, the Amendment, 13 U.S.C. § 141(b), and Section 209. Article I apportions representatives among the states, and the Supreme Court recognized standing to claim the agencies violated Article I in

27

apportioning seats. The Framers drafted the Amendment to ensure that states that ensured their citizens' right to vote received more representation in Congress. United States Code Title 13, Section 141(b) implements both of those constitutional provisions. And in Section 209, Congress expanded plaintiffs' ability to claim the Census Bureau, in its statistical calculations, violated 13 U.S.C. § 141(b) and the Constitution. Citizens' vote-dilution injuries bring them within every provision's zone of interests.

The zone-of-interests test also confirms Citizens' procedural right to claim the Census Bureau violated the required procedures. Nothing requires participation in the procedure the plaintiffs allege the agency violated. Because Citizens have procedural rights to require the Census Bureau to complete the Amendment procedures, they need not prove for certain that remand would redress their vote-dilution injuries.

In particular, a court can redress Citizens' injuries through remand or a writ of mandamus that requires the Census Bureau to complete the Amendment's procedures. That could restore seats to New York and Pennsylvania. Citizens also seek vacatur of the Report, which would immediately restore the 2010 report and the seats New York and

Pennsylvania lost. Finally, Citizens seek declaratory and injunctive relief to redress their census-based, vote-dilution injuries. By showing Citizens' members' injury, causation, and redressability, Citizens demonstrated Article III standing.

## ARGUMENT

Citizens satisfied all three elements of Article III standing for their malapportionment claims. *See* 13B Charles Alan Wright & Arthur R. Miller, Fed. Practice & Proc. § 3531, § 3531 n. 62 (3d ed. 2008) (recognizing that, for voting-rights cases, "[o]rdinarily, courts do not even pause to confirm standing . . ."). Citizens claim standing as a representative of its members—not based on injuries to the organization. *See Warth*, 422 U.S. 511. An organization like Citizens satisfies Article III representational standing when (1) one member shows individual standing, (2) "the interests at stake are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 169 (2000). Citizens satisfy the second and third elements

29

because they seek to improve democratic elections, and because no member needs to participate in this lawsuit. App-130.

On the first element, Citizens proved its members' injury, causation, and redressability. At bottom, Citizens seek routine judicial review of agency action based on an improper legal ground, and the Supreme Court recognizes that plaintiffs like Citizens usually have standing. *See FEC v. Akins*, 524 U.S. 11, 25 (1998) ("[T]hose adversely affected by a discretionary agency decision generally have standing to complain that the agency based its decision upon an improper legal ground.").

The district court asked if "the remedy for this [is] the political process?" App-211. Citizens request remedies to do precisely that: vacate, remand, mandamus, and declare the Report illegal and to return it to the Executive Branch to implement the Amendment. Courts commonly serve this role. In voting rights cases, the Supreme "Court has sought to delegate the responsibility for putting [apportionment] principles into effect to actors it views as more appropriately 'political.'" Pamela S. Karlan, *All Over the Map: The Supreme Court's Voting Rights Trilogy*, 1993 Sup. Ct. Rev. 245, 254 (1993). In any event, the political question doctrine determines whether the Constitution

delegates responsibility to a political branch. *See Zivotofsky v. Clinton*, 566 U.S. 189, 195-96 (2012). But the Supreme Court already rejected arguments that apportionment decisions present political questions, *Baker*, 369 U.S. at 198, and already rejected arguments that census calculations do. *Montana*, 503 U.S. at 457-59.

Ultimately, courts do not deny standing because a case may have political repercussions. *See Nixon v. Herndon*, 273 U.S. at 540 ("The objection that the subject matter of the suit is political is little more than a play upon words."). Indeed, this case will have political consequences either way. Even "[a] judicial decision *not* to adjudicate voting rights claims will have distinctive political consequences, since it effectively freezes into place the resolution already obtained by a particular political faction." Pamela S. Karlan, *All Over the Map*, 1993 Sup. Ct. Rev. at 254. The Framers of the Amendment armed future citizens with tools to thwart the forces that seek to undermine democracy, and courts have developed a lengthy history of zealously guarding the democracy that our Constitution created.

Indeed, the political branches rely on the judicial branch to enforce the Constitution's voting rights requirements. United States Attorney

31

General Merrick B. Garland recognized that important role. He stated, a "healthy democracy . . . means ensuring that all eligible voters can cast a vote," and that "[t]he Department of Justice will never stop working to protect the democracy to which all Americans are entitled." Policy Address Regarding Voting Rights (June 11, 2021).[3] He acknowledged that "actually securing the protections guaranteed by our Constitution and Laws has always required vigilant enforcement by Congress, the courts, and the Justice Department." *Id.* When the Executive Branch breaches its duties, the Constitution requires this Court's vigilance even more.

## I. Citizens demonstrated the Report caused them concrete, vote-dilution injury.

Citizens satisfied Article III standing by demonstrating injury, fair traceability, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992). They allege a concrete, particularized vote-dilution injury because the Report gave Citizens' members' states (New York and Pennsylvania) one fewer seat.

---

[3] https://www.justice.gov/opa/speech/attorney-general-merrick-b-garland-delivered-policy-address-regarding-voting-rights.



App-26; App-166. A single citizen's "loss of a Representative to the United States Congress undoubtedly satisfies the injury-in-fact requirement of Article III standing." *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 331 (1999) (pre-census claim); *Utah*, 536 U.S. at 459-61 (post-census claim). Therefore, the Report diluted Citizens' members' votes. App-39 (declaring, "The Census Bureau's 2021 Census injured me by resulting in the State of New York receiving one fewer seat in the U.S. House of Representatives (from 27 to 26

seats).”); App-37 (declaring, “Pennsylvania lost a seat in the U.S. House of Representatives.”).

The district court questioned whether Citizens suffered particularized injury. App-173. Citizens’ members are not claiming a “generally available grievance about government . . . .” *Lujan*, 504 U.S. at 573. They allege concrete vote-dilution injuries that the Report caused to citizens of only seven states. App-166. As citizens of two of those states, Citizens’ members suffered particularized injuries, and not just a generic, “every citizen’s interest in proper application of the Constitution and laws.” *Lujan*, 504 U.S. at 573. When a voter lives in a malapportioned district, that voter has standing to challenge the malapportionment. *Gill v. Whitford*, 138 S. Ct. 1916, 1931-32 (2018). Here, the malapportioned districts are the states of New York and Pennsylvania. Citizens thus seek a remedy that benefits them more than the “public at large.” *Lujan*, 504 U.S. at 574.

Although Citizens’ members’ states have millions of citizens, concrete injury “widely shared” still satisfies Article III. *See Akins*, 524 U.S. at 24. Indeed, voting rights “to be vindicated in a suit challenging an apportionment scheme are personal and individual . . . .” *Reynolds*, 377

34

U.S. at 562 n.39 (quotations omitted). Therefore, dilutions by fractions of a vote qualify as injury. *United States v. SCRAP*, 412 U.S. 669, 690 n.14 (1973). A single Indiana citizen's standing met Article III for a census claim. *U.S. House of Representatives*, 525 U.S. at 330-32. Citizens' members thus suffered particularized injuries.

Citizens' vote-dilution injuries also qualify as concrete and actual. The Supreme Court has cautioned courts against finding procedural injury "*in vacuo*," when an illegal procedure did not cause concrete injury. *Summers*, 555 U.S. at 496. But that statement does not apply here. Voting is "a fundamental political right, because preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). Vote-dilution injuries qualify as concrete injuries. *Wesberry*, 376 U.S. at 17 ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live."). Citizens suffered concrete, actual, particularized injury—not conjectural, nor hypothetical, nor "*in vacuo*" injury. *See U.S. House of Representatives*, 525 U.S. at 331.

## II. The Report caused that vote-dilution injury.

The Report caused Citizens' members' vote-dilution injury. App-166. But-for injury demonstrates causation for Article III standing. *See Duke Power Co. v. Carolina Env. Study Grp.*, 438 U.S. 59, 78 (1978). In other words, "an injury resulting from the application . . . of an unlawful enactment remains fairly traceable to such application . . . ." *FEC v. Ted Cruz for Senate*, 142 S. Ct. 1638, 1647 (2022). Citizens' vote-dilution injury results from the unlawful Report, and that proves fair traceability.

The United States Code required the Secretary of Commerce to send the Report to the President, and it required the Report to apportion seats in the U.S. House of Representatives. 13 U.S.C. § 141(b). The Code required the President to send a statement to Congress, and that statement entitles "[e]ach State . . . to the number of Representatives shown in the statement . . . ." 2 U.S.C. §§ 2a(a), 2b. The Report allocated one fewer seat to New York and one fewer seat to Pennsylvania. In black-and-white, the Report caused Citizens' concrete, vote-dilution injuries. App-166. Citizens' injury fairly traces to the Report. *See Utah*, 536 U.S. at 459-61.

36

This case differs from cases in which plaintiffs seek *additional* seats. The Report harmed Citizens by *eliminating* a seat. The district court analogized this case to *Franklin v. Massachusetts*, 505 U.S. at 802. App-156. But there, Massachusetts faced a higher burden of causation because it alleged that, under its interpretation of the Constitution, it deserved "an *additional* Representative" seat. 505 U.S. at 802 (emphasis added). That explains why Massachusetts "had to show that [it] would have had an additional Representative if the allocation had been done using some other source of more accurate data." App-156 (quotations omitted).

Citizens need not prove they would receive an *additional* seat because they assert a different injury. They assert concrete injury from the Report *eliminating* their states' seats. *See Brown*, Slip Op. *16 ("While it might be uncertain whether undertaking an environmental impact statement would prevent the dam from being built, it is clear that building the dam would directly injure the landowner"). But-for the Report, New York and Pennsylvania would have each had one more seat. Proof of that causation requires no calculations. It requires only reading the Report: "New York . . . -1," and "Pennsylvania . . . -1." App-

166. Citizens thus present the same injury as the State of Montana asserted. There, Montana's "loss of one seat cut its delegation in half and precipitated th[at] litigation." *Montana*, 503 U.S. at 445. Whether a court order requiring the Census Bureau to comply with the Amendment would cure Citizens' concrete injury presents an issue of redressability—not causation. Here, the illegal agency action (the Report) caused Citizens' vote-dilution injury by taking away seats from New York and Pennsylvania.

## III. Citizens proved redressability because a new Report could remedy their injuries.

Citizens demonstrated standing under 5 U.S.C. § 702 to bring their claim the Census Bureau violated the Amendment's procedure. That statute expands standing to persons aggrieved by agency action and meeting the zone-of-interests test. *See Japan Whaling*, 478 U.S. 230 n.4. Meeting the zone-of-interests test also gives plaintiffs a procedural right and entitles them to a lower redressability burden by demonstrating that complying with the procedure could redress their injury. Citizens proved the Report aggrieved them; they proved their injuries bring them within the zone of interests for Article I, the Amendment, 13 U.S.C. § 141(b), and Section 209; and they proved that

38

complying with the procedure could redress their concrete injuries. Thus, they proved redressability.

Congress possesses constitutional powers to broaden injuries that qualify for Article III standing. U.S. Const. art. III, sec. 1 (allowing Congress to vest jurisdiction "in such inferior Courts as the Congress may from time to time ordain and establish."); *United States v. Denedo*, 556 U.S. 904, 911-12 (2009) ("Assuming no constraints or limitations grounded in the Constitution are implicated, it is for Congress to determine the subject-matter jurisdiction of federal courts."). By statute, Congress can expand injuries that qualify for Article III standing to "*de facto* injuries that were previously inadequate in law . . . ." *Lujan*, 504 U.S. at 578. It can "articulate chains of causation that will give rise to a case or controversy where none existed before." *Massachusetts v. EPA*, 549 U.S. 497, 516 (2006) (quotations omitted). It can even "define new legal rights" in new contexts. *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 773 (2000).

In 5 U.S.C. § 702, Congress expanded standing to aggrieved plaintiffs, like Citizens. As its "central purpose," the APA "provid[es] a broad spectrum of judicial review of agency action." *Bowen v.*

*Massachusetts*, 487 U.S. 879, 903 (1988). Under the APA's "generous review provisions," the Supreme Court directs courts to give the APA "a hospitable interpretation." *Abbott Labs.*, 387 U.S. at 141 (quotations omitted)). Congress allowed any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute . . ." to claim that the agency violated a law. 5 U.S.C. §§ 702, 706. Citizens' claims fit well within those "generous review provisions." And even if they do not, the writ of mandamus forms a backstop to ensure Citizens can enforce the Amendment's procedure.

A. The Report aggrieved Citizens by causing vote-dilution injury.

The Report aggrieved Citizens by causing their vote-dilution injury. Citizens also brought their APA claim under Section 209, which cements them as aggrieved parties.

When Congress uses the word "aggrieved," it "define[s] standing as broadly as is permitted by Article III . . . ." *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1303 (2017) (quotations omitted); *Akins*, 524 U.S. at 19 ("History associates the word 'aggrieved' with a congressional

40

intent to cast the standing net broadly . . . .”). The Report aggrieved Citizens by causing their vote-dilution injury.

In addition, the 1997 Congress assigned the Census Bureau an additional statutory duty in Section 209. There, Congress defined “an aggrieved person” to include “any resident of a State whose congressional representation or district *could* be changed as a result of the use of a statistical method challenged in the civil action.” Section 209(d)(1) (emphasis added). Citizens’ members qualify as aggrieved under that definition because their states’ representation could change.

The district court required Citizens to prove that “the loss in representation was caused by the Census Bureau’s alleged failure to follow the Fourteenth Amendment.” App-152. That fundamentally misapprehends 5 U.S.C. § 702. Section 702 extends jurisdiction to people “adversely affected or aggrieved *by agency action*.” (Emphasis added.) It asks whether the *agency action* caused the injury—not whether the *legal violation* caused the injury. *Data Processing Serv. v. Camp*, 397 U.S. 150, 152 (1970) (asking whether “the challenged action has caused [the plaintiff] injury in fact . . . .”). Section 209(d)(1) also requires no proof the legal violation caused the injury. The Report

aggrieved Citizens by causing their vote-dilution injury. *See WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013).

B. <u>Citizens' injuries bring them within the zone-of-interests for several provisions.</u>

Aside from proving the Report "aggrieved" Citizens, the APA requires Citizens to prove that they are aggrieved "within the meaning of a relevant statute." 5 U.S.C. § 702. The Supreme Court implements that requirement as the zone-of-interests test. *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395-97 (1987). Citizens satisfied that requirement, as well. Their vote-dilution injury brings them within the zone of interests of Article I, the Amendment, 13 U.S.C. § 141(b), and Section 209.

The zone-of-interest test qualifies as an element of the cause-of-action—and not as an element of the Article III case-or-controversy requirement. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125-26 (2014). The Supreme Court abrogated the phrase "prudential standing" as a "misleading label" and a "misnomer." *Id.* at 125, 127 (quotations omitted). It also criticized the label "statutory standing" because the zone-of-interests test relates to the cause-of-action and not the court's "statutory or constitutional power to

42

adjudicate the case." *Id.* at 128 n.4 (quotations omitted). Therefore, courts do not dismiss cases "on grounds that are 'prudential,' rather than constitutional" because doing so would contravene a federal court's "virtually unflagging" obligation "to hear and decide cases within its jurisdiction . . . ." *Id.* at 126 (quotations omitted); *Cohens*, 19 U.S. at 404.

Nonetheless, courts use the zone-of-interest test to determine "who may invoke the cause of action . . . ." *Lexmark*, 572 U.S. at 130. That test permits lawsuits without any "explicit provision in the relevant statute" or affirmative proof "of congressional purpose to benefit the would-be plaintiff." *Clarke*, 479 U.S. at 394, 399-400. Instead, courts apply a "presumption in favor of judicial review of agency action." *Id.* at 399. Even if "the plaintiff is not itself the subject of the contested regulatory action," *id.*, courts only deny a right of review if the plaintiffs' interests are "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Lexmark*, 572 U.S. at 130 (quotations omitted). Under 5 U.S.C. § 702, that test is "lenient" and "not especially demanding," so the APA can permit suits

"for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review." *Id.*

For two examples, the Supreme Court recognized data processing services companies fit within the banking statutes' zone of interests to claim the Comptroller of the Currency violated the statutes by allowing banks to engage in data processing services, as well. *Data Processing Serv.*, 397 U.S. 150 (reversing the court of appeals). It also recognized that nearby landowners fit within the zone of interests of a statute that allowed the Department of the Interior to take land into trust for a tribe to build a casino. *Match-E-Be-Nash-She-Wish Band of Indians v. Patchak*, 567 U.S. 209, 214, 224 (2012).

Citizens' vote-dilution injuries bring them within the zone of interests for Article I, the Amendment, 13 U.S.C. § 141(b), and Section 209. In *Wesberry*, the Supreme Court effectively recognized that citizens suffering from malapportionment vote-dilution come within the zone of interests for Article I. 376 U.S. at 3-4 ("in debasing the weight of appellants' votes the State has abridged the right to vote for members of Congress guaranteed them by the United States Constitution"). With the Amendment, the Framers amended Article I, and that makes the

44

Amendment part of the "overall context" of the constitutional "scheme" for Article I. *See Clarke*, 479 U.S. at 399, 401; CG74; CG1622 ("Slavery being dead, it becomes us at once to alter the representation based upon [the three-fifths clause]."). Of course, 13 U.S.C. § 141 implements Article I. Thus, Citizens fit within the zone-of-interests for that statutory provision, Article I, and the Amendment.

Citizens' vote-dilution injuries also bring them directly within the zone of interests for the Amendment. The Framers defined the evil: "political power should be possessed in all the States exactly in proportion as the right of suffrage should be granted . . . ." Reconstruction Report XIII. The Framers aimed to protect citizens from vote-dilution that would result by malapportioning seats to states who denied or abridged their citizens' right to vote. "[R]epresentation does not belong to those who have not political existence, but to those who have. The object of the amendment is to enforce this truth." CG358; *see also id.* at 278, 2767. Again, 13 U.S.C. § 141(b) delegates that responsibility to the Census Bureau. Citizens' vote-dilution injuries bring them well within the Amendment's and 13 U.S.C. § 141(b)'s zone of interests, too.

Finally, the Supreme Court effectively held that vote-dilution claims based on the census fall within Section 209's zone of interests. *See U.S. House of Representatives*, 525 U.S. at 331-33; *Utah*, 536 U.S. at 462-63. Congress passed Section 209 to expand standing to citizens for claims that the Census Bureau's apportionment decisions violate the Constitution. It intended to enforce "section 2 of the 14th article of amendment to the Constitution," and directed the Census Bureau "to perform the entire range of constitutional census activities . . . ." Section 209(a)(3), (9). Citizens' vote-dilution claims fall within Section 209's zone of interests, too.

Citizens demonstrated the Report aggrieved them and demonstrated that they fit within the zone of interests for Article I, the Amendment, 13 U.S.C. § 141(b), and Section 209. Therefore, Section 702 ratifies Citizens' standing to claim the Census Bureau violated the Amendment's procedural requirements. *See Japan Whaling*, 478 U.S. 230 n.4. The zone-of-interests test applies even for Citizens' mandamus claim. *See Bank of Am. Corp.*, 137 S. Ct. at 1302 (incorporating the zone-of-interest test for every statute giving a cause of action).

46

C. Because Citizens meet the zone-of-interests test, they have procedural rights that make redressability easier to prove.

Citizens proved redressability because they seek to enforce a procedural right and because a court order can redress their vote-dilution injury, even if that redress is not certain. *See Brown*, No. 22-535, Slip Op. \*16. For Article III, claims that agencies violated procedural requirements are "special." *Lujan*, 504 U.S. at 572 n.7. Plaintiffs asserting those rights need not "meet[] all the normal standards for redressability and immediacy." *Id.* If the Census Bureau implements the Amendment procedure, its new decision could remedy Citizens' vote-dilution injury. That is all Article III requires. *See id.*

The district court held that Citizens were "never *entitled* to a procedure" because it found no statute or constitutional provision "designed to protect" Citizens. App-161. But courts use the zone-of-interests test to make that determination, and the district court never applied that test. Citizens meet the zone-of-interests test for Article I, the Amendment, 13 U.S.C. § 141(b), and Section 209. Those provisions provide them a procedural right and entitle them to seek enforcement.

The Supreme Court uses the zone-of-interests test as the "appropriate tool" for determining whether provisions are "designed to

47

protect" plaintiffs' interests. *Lexmark*, 572 U.S. at 130, 130 n.5. The

Supreme Court allows plaintiffs to assert procedural rights "so long as

the procedures in question are *designed to protect* some threatened

concrete interest of [theirs] that is the ultimate basis of [their]

standing." *Lujan*, 504 U.S. at 573 n.8 (emphasis added). It developed

the zone-of-interests test based on a common-law rule that allowed a

plaintiff to recover for injuries caused by a statutory violation if "the

statute is interpreted as *designed to protect* the class of persons in

which the plaintiff is included, against the risk of the type of harm

which has in fact occurred as a result of its violation." *Lexmark*, 572

U.S. at 130 n.5 (quotations omitted, emphasis added); *Lujan v. Nat'l*

*Wildlife Fed'n*, 497 U.S. 871, 886 (1990) (using the "designed to protect"

language for the zone-of-interests test). This Court also recognizes that

the zone-of-interests test determines whether a statute gives a plaintiff

a procedural right. *Int'l Bhd. of Teamsters v. Pena*, 17 F.3d 1478, 1484

(D.C. Cir. 1994) ("Standing to assert procedural protections is thus

derivative; a party within the zone of interests of any substantive

authority generally will be within the zone of interests of any

procedural requirement governing exercise of that authority, at least if

the procedure is intended to enhance the quality of the substantive decision.").

The district court never applied the zone-of-interests test. *See* App-161. But because, as shown above, Citizens' injuries bring them within the zone of interests of the Amendment, Article I, 13 U.S.C. § 141(b), and Section 209, they have a procedural right to claim the Census Bureau violated the Amendment's procedure.

The Amendment directs that the United States "shall" reduce a state's "basis of representation" when that state denies or abridges (with exceptions) its citizens' rights to vote. The Census Bureau has no discretion to decline to complete that procedure. *See SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1354 (2018) ("The word 'shall' generally imposes a nondiscretionary duty."). That "shall" language makes the Amendment self-executing. Arthur Earl Bonfield, *Right to Vote and Judicial Enforcement of Section Two of the Fourteenth Amendment*, 46 Cornell L. Rev. 108, 115 (1960) ("no enforcing legislation seems necessary."); *see City of Boerne v. Flores*, 521 U.S. 507, 524 (1997) ("As enacted, the Fourteenth Amendment confers substantive rights against

the States which, like the provisions of the Bill of Rights, are self-executing.").

Indeed, the Constitution always requires agencies to comply with it, and it prohibits Congress from assigning agencies unconstitutional means for accomplishing objectives. *Panama Refining Co. v. Ryan*, 293 U.S. 388, 433 (1935) ("When the President is invested with legislative authority as the delegate of Congress in carrying out a declared policy, he necessarily acts under the constitutional restriction applicable to such a delegation."); *St. Joseph Stock Yards Co. v. United States*, 298 U.S. 38, 52 (1936). Delegations to the FCC, for example, need not specify that the FCC follow the First Amendment. So too here. Congress made the "reapportionment process self-executing, eliminating the need for Congress to enact an apportionment Act after each decennial census . . . ." *Montana*, 503 U.S. at 452 n.25. Because Citizens are within the zone-of-interests, they have a procedural right to claim the Census Bureau violated the Amendment's procedure when completing the apportionment Report. *See Int'l Bhd. of Teamsters*, 17 F.3d at 1484.

> *1. Plaintiffs can establish procedural rights without showing a right to participate in the illegally completed procedure.*

The district court rejected Citizens' claim of a procedural right because, it held, procedural rights "usually" arise when private parties have a right to participate in a procedure, and Citizens demonstrated no right to participate in the Report procedure. App-161. The district court erred by adding a new requirement to the text of 5 U.S.C. § 702 and by committing a logical fallacy. Nothing requires a plaintiff to demonstrate a right to participate in a particular procedure before asserting a procedural right to claim an agency completed that procedure illegally.

The district court had no right to amend 5 U.S.C. § 702 to add new standing requirements. "[O]ur constitutional structure does not permit [courts] to 'rewrite the statute that Congress has enacted.'" *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938, 1949 (2016). The text requires only proof of aggrievement and plaintiffs arguably within the zone of interests. The district court effectively amended Section 702, and that alone requires reversal.

The district court also committed a logical fallacy by using the word "usually" and by making a universal conclusion. *See* App-161. Although

the district court cited the paradigmatic situation of procedural rights arising from agencies thwarting participation, it was "too quick to generalize and in doing so [ran] afoul of the logical fallacy of accident." *McClendon v. City of Albuquerque*, 630 F.3d 1288, 1292 (10th Cir. 2011) (Gorsuch, J.). As then-Judge Neil Gorsuch explained, "Just because all the people you've met lately are kind doesn't mean all people are kind." *Id.* For the same reason, just because the procedural rights that come to mind raise public-participation claims, that does not mean all procedural rights raise public participation claims. *See id.* Even the district court's own language uses the word "usually," which means "not all." It took no effort to identify what else qualifies.

The district court cited *Summers*, but that case does not justify a universal rule that only public participation claims qualify as procedural rights. There, the plaintiffs claimed the Forest Service illegally denied their right to comment on a timber-sale-project decision, and the approval threatened the plaintiffs' "concrete plans to observe nature in that specific area." *Summers*, 555 U.S. at 497. Although the Supreme Court did not expect plaintiffs' comment to change the decision, it recognized their standing. *Id.* (It ultimately dismissed the

case because a settlement had already resolved the asserted injury. *Id.* at 494-95, 497.)

*Summers* effectively held that *if* a plaintiff loses an opportunity to participate in a procedure, *then* the plaintiff *has* a procedural right to challenge that procedural violation. *Id.* at 494-95. Giving force to the opposite implication would result in another logical fallacy: *if* a plaintiff does *not* lose an opportunity to participate in a procedure, *then* the plaintiff *does not have* a procedural right to challenge that procedural violation. *See Crouse-Hinds Co. v. InterNorth, Inc.*, 634 F.2d 690, 702-03 n.20 (2d Cir. 1980) ("The proposition that 'A implies B' is not the equivalent of 'non-A implies non-B,' and neither proposition follows logically from the other. The process of inferring one from the other is known as 'the fallacy of denying the antecedent.'" (citing J. COOLEY, A PRIMER OF FORMAL LOGIC 7 (1942)) (cited by RUGGERO J. ALDISERT, LOGIC FOR LAWYERS 162 (3d ed. 1997)). According to formal logic, *Summers* does not require participation in a procedure before asserting a procedural right. Several other cases confirm that result.

The *Lujan* court identified *Japan Whaling* as an example of a qualifying procedural right. 504 U.S. at 573 n.8. But those plaintiffs had

53

no right to participate in the procedure they claimed was illegal. The
Supreme Court required proof of only the basic Section 702
requirements of aggrievement and zone of interests. *Japan Whaling*,
478 U.S. 230 n.4. There, a treaty protected whale populations by setting
quotas on whale harvests. *Id.* at 224-25. The treaty did not authorize
sanctions for exceeding the quotas, so Congress passed a statute that
made U.S. sanctions mandatory if the Secretary of Commerce found a
country's citizens exceeded the quota. *Id.* at 226-27. When Japan
exceeded those thresholds one year, the Secretary negotiated a
resolution instead of making findings that would require sanctions. *Id.*
at 227-28. Wildlife-conservation-group plaintiffs sued to compel the
Secretary to make those findings. *Id.* at 228-29. The Supreme Court
recognized standing although the plaintiffs had no right to participate
in the procedure that would decide whether Japan exceeded the quotas.
*Id.* at 229-31, 230 n.4.

*Lujan* provides two more examples of courts recognizing procedural
rights without participation requirements. First, the Supreme Court
explained that "one living adjacent to the site for proposed construction
of a federally licensed dam has standing to challenge the licensing

54

agency's failure to prepare an environmental impact statement . . . ." *Lujan*, 504 U.S. at 572 n.7. The Supreme Court's statement recognized a procedural right without mentioning any right to participate. Second, the *Lujan c*ourt recognized plaintiffs had asserted procedural rights in *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989). 504 U.S. at 572 n.8. But the *Robertson* plaintiffs brought no claims the Forest Service violated any public participation procedures. 490 U.S. at 335-36. They claimed the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321 to 4347, required fully developed mitigation measures and a worst-case-scenario analysis. *Id. Robertson* affirms the zone-of-interests test gives plaintiffs procedural rights to assert any procedural violation in the statute.

In 2021, the Supreme Court again allowed plaintiffs to assert procedural rights although those plaintiffs had no right to participate in the procedure. In *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021), a class of individual plaintiffs claimed the TransUnion credit reporting company violated their procedural rights in 15 U.S.C. § 1681e(b). That section required TransUnion to "follow reasonable procedures to assure maximum possible accuracy" of the plaintiffs'

credit files. The Court assumed TransUnion breached that requirement "to use reasonable procedures . . . ." *TransUnion*, 141 S. Ct. at 2208. Although the plaintiffs had no right to participate in TransUnion's file maintenance, the Supreme Court recognized Article III standing to bring a "reasonable-procedures claim," as long as the plaintiffs suffered concrete harm from TransUnion violating that procedure. *Id.* at 2200, 2208-09. Again, Congress designed a procedure to protect a person, and Article III gave that person a right to claim the defendant violated the procedure—even without any right to participate. These cases all refute the district court's participation requirement.

The district court relied on *Renal Physicians Association v. U.S. Department of Health and Human Services*, 489 F.3d 1267, 1278 (D.C. Cir. 2007), for the basic *Lujan* requirement that plaintiffs demonstrate the statute was "designed to protect" them. App-161. The district court read that phrase to protect individuals only if they have a right to participate in the procedure. *Id.* But that case did not apply test. The *Renal Physicians* court *assumed* a procedural right and denied standing because the physicians proved no chance of redressability based on likely third-party actions.

In *Renal Physicians*, some physicians sued the Department of Health and Human Services' (HHS) because health-care facilities had reduced their compensation based on HHS's new safe-harbor definition. 489 F.3d at 1271. Congress had prohibited physicians from referring patients to health-care facilities in which the physicians had a financial interest (likely to stop unscrupulous physicians from increasing referrals to make more Medicaid money). *Id.* at 1269. After HHS defined a safe harbor that allowed physicians to refer patients to health-care facilities if the physicians only worked there for fair market value, some health-care facilities reduced physician compensation to HHS's fair-market-value definition. *Id.* at 1270-72. The court assumed the physicians had a procedural right to claim the safe harbor was illegal, but it held the injury was not redressable. *Id.* at 1279. By then, the third-party health-care facilities already found they could "pay lower wages and still function effectively," and the economic forces would "hold in place" the lower compensation "even if a court were to invalidate the safe harbor." *Id.* at 1278-79. The court dismissed the case for lack of redressability.

Here, in contrast, no third parties exist, and no external forces preclude the possibility that, if the Census Bureau completed the Amendment process, it could cure Citizens' vote-dilution injury. Citizens proved a procedural right to object to the Report because they proved aggrievement and because they fit within the zone of interests for Article I, the Amendment, 13 U.S.C. § 141(b), and Section 209. *See Japan Whaling*, 478 U.S. 230 n.4; *Int'l Bhd. of Teamsters*, 17 F.3d at 1484.

### 2. Citizens sought relief that can redress their injuries.

Under their procedural right, Citizens demonstrated that remand or a writ of mandamus, vacatur, declaratory relief, or injunctive relief could redress their injuries. The district court even recognized that possibility. App-223 ("Especially when you do the voter registration impact, it's going to throw a real wrench into the works. Like every state is going to have some pretty big [e]ffect. So we don't know for sure whether it's going to help one state, hurt another state. We just know it's going to shake things up a lot and they've got three states."), -225 to -226. In other words, remand could redress Citizens' injuries.

In *non*-procedural-rights cases, courts find redressability if "the exercise of the Court's remedial powers would redress the claimed injuries." *Duke Power*, 438 U.S. at 74. Courts ask whether, if a court used its powers, it could redress the injury—even in part. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796, 801 (2021) ("the ability to effectuate a partial remedy satisfies the redressability requirement." (quotations omitted)). At times, courts ask if an injury is "'likely to be redressed by a favorable decision,'" but that formulation does not authorize courts to predict whether they intend ultimately to enter the remedy the plaintiff requests. *Duke Power*, 438 U.S. at 75 n.20. Courts inquire only into the "likelihood" that, if granted, a requested remedy could cure the injury. *Id.* Even if a court might not issue the remedy the plaintiffs seek, that does not preclude standing. *Baker*, 369 U.S. at 208 ("It would not be necessary to decide whether appellants' allegations of impairment of their votes by the 1901 apportionment will, ultimately, entitle them to any relief, in order to hold that they have standing to seek it.").

In procedural-rights cases, in contrast, plaintiffs prove redressability even when they do not "establish with any certainty" that success on the lawsuit will result in agency action that remedies their concrete

injury. *Lujan*, 555 U.S. at 572 n.7; *Brown*, No. 22-535, at *11; *see also Massachusetts v. EPA*, 549 U.S. at 518 ("When a litigant is vested with a procedural right, that litigant has standing if there is *some possibility* that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." (emphasis added)). Courts "tolerate uncertainty over whether observing certain procedures would have led to (caused) a different substantive outcome, as with *Lujan*'s example of the dam and the bypassed environmental impact statement." *Brown*, Slip Op. 15. Because Citizens brought procedural-rights claims, they easily prove the relief they seek could redress their vote-dilution injuries.

> a. Remand or a writ of mandamus would redress Citizens' injuries.

Plaintiffs who bring malapportionment claims based on the census prove Article III redressability when "courts can order the Secretary of Commerce to recalculate the numbers and to recertify the official census result." *Utah*, 536 U.S. at 461. In part, Citizens seek that recalculation relief for their APA and mandamus claims. App-148. "If the record before the agency does not support the agency action . . . the proper course, except in rare circumstances, is to remand to the agency

for additional investigation or explanation." *Fla. Power Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). The Census Bureau conceded its record will not support its action. App-11. That concession makes Citizens' requests for remand and mandamus redressable.

The district court held that it could not know if remand or mandamus would give Citizens' states additional seats. App-159. Article III does not require Citizens to prove for certain that their members' states would receive additional seats. Remand and mandamus give Citizens a chance that, if the Census Bureau completes the Amendment procedure, it could change the Report and give New York and Pennsylvania more seats. That relief qualifies as redress. *Cf. Denedo*, 556 U.S. at 909-10 (recognizing a decision that "reversed and remanded . . . conferred a palpable benefit on respondent; for a chance of success on the merits, however slight, is superior to no possibility at all.").

New York would have retained its seat if it had just 89 more residents. That puts New York first on the list for another seat. App-64; Census Bureau, Table B1, Top Ten Runner-Up States to Almost Gain

Another Congressional Seat: 2020 Census (2021).[4] It is more likely that Citizens will obtain a favorable outcome than it is likely an administrator would change his or her mind and decide not to build a dam because of an environmental impact statement. *See Lujan*, 555 U.S. at 572 n.7. The ultimate policy decision in those situations always remains with the administrator. *Strycker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 227 (1980).

The district court put Citizens in a Catch-22 by requiring them to prove their harm before the Census Bureau completes the analysis that could show their harm. *See* App-159. Courts avoid those Catch-22s by "tolerat[ing] uncertainty" in the ultimate result after completing a procedure. *Brown*, Slip Op. at *3. This Court recently rejected a Catch-22 and remanded to an agency that thrust its analysis responsibilities onto plaintiffs to prove injury. *Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n*, 896 F.3d 520, 523 (D.C. Cir. 2018) (Garland, C.J.). A tribe had claimed the agency violated NEPA by approving a uranium

---

[4] https://www2.census.gov/programs-surveys/decennial/2020/data/apportionment/apportionment-2020-tableB.pdf.

mine near the tribe's "cultural, historical, and religious sites." *Id.* The

agency acknowledged NEPA violations but declined to stop mining until

the tribe proved irreparable harm. *Id.* at 522-23. In overturning the

agency action, the D.C. Circuit held that NEPA does not "permit an

agency to condition performance of its [environmental analysis]

obligation on a showing of irreparable harm." *Id.* The court labeled that

procedure a "classic Catch-22." *Id.* It recognized that "placing the

burden on the Tribe to show harm was especially inappropriate because

the inadequate [environmental impact statement] may well make doing

so impossible." *Id.* at 534-35. So too here. The Census Bureau's failure

to complete the Amendment process makes impossible any requirement

for Citizens to show how completing that procedure would redress their

injuries.

The district court relied heavily on *Sharrow v. Brown*, 447 F.2d 94

(2d Cir. 1971), to require Citizens "to collect the data necessary to show

what apportionment might look like if its legal theory is correct." App-

159. It misplaced its reliance on that non-APA opinion. Those plaintiffs

had demonstrated no procedural right. Therefore, that court stuck the

plaintiffs in a Catch-22 to complete the "Herculean task" of proving

standing by "a state-by-state study of the disenfranchisement of adult [citizens], a task of great proportions" before the Census Bureau completed that study. *Id.* at 97. Again, the APA does not stick plaintiffs in Catch-22s. *See Oglala Sioux*, 896 F.3d at 523.

Moreover, *Swann v. Adams*, 385 U.S. 440, 445-46 (1967), controls over *Sharrow*. There, the Supreme Court affirmed the plaintiffs' standing for their malapportionment claim because they "placed before the court their own plan" that demonstrated a "feasible," and "closer approximation" to the legal ideal—although "their suggested amendments to the legislative plan might have been infirm in other respects . . . ." *Swann*, 385 U.S. at 445-46. The *Sharrow* plaintiff produced "no evidence." 447 F.2d at 97. Here, Citizens provided three plans that are all closer to the legal ideal than the Census Bureau's abject failure to implement the Amendment—even if plaintiffs' apportionment approach was not exactly what the Census Bureau will do. App-46 to -52. A direct application of *Swann* demonstrates Citizens' standing despite *Sharrow*.

Even if this Court sought *Sharrow*'s statistical proof that remand would give one of Citizens' members' states an additional seat (an

inquiry the Court has no basis to undertake), Citizens provided that
proof in their alternate argument that voter registration lists reflect the
citizens denied the right to vote under the Amendment (assuming that
Citizens brought no photo voter ID law argument). *See* Fed. R. Civ. P.
8(d)(2) (allowing argument in the alternative); App-146. Citizens used
the Census Bureau's voter registration data to show Virginia would
have received another seat if the Census Bureau counted unregistered
voters as denials of their rights to vote. App-49. Citizens' Virginia
member thus proved the Report caused a vote-dilution injury, and
Citizens showed statistics that satisfy even *Sharrow*'s test because
completing the Amendment process would redress that Virginia
plaintiff's injury. App-124; 447 F.2d at 97.

The district court effectively demanded Citizens to demonstrate a
counterfactual injury by requiring Citizens to prove how the Census
Bureau would have implemented the Amendment. *See* App-159. But to
avoid speculation into agency decision-making, the Supreme Court
*prohibits* courts from requiring proof of counterfactual outcomes of
procedures. In 2010, a plaintiff claimed that the Securities and
Exchange Commission acted unconstitutionally in appointing members

of the Public Company Accounting Oversight Board because it appointed them by committee and not by the chairperson. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 512 n.12 (2010). The United States argued the plaintiffs lacked Article III standing to bring that claim because the chairperson never objected to any appointment by the committee. *Id.* The Supreme Court rejected that argument because it could not "assume" the chairperson "would have made the same appointments acting alone . . . ." *Id.* Article III standing, it held, "does not require precise proof of what the [agency's] policies might have been in that counterfactual world." *Id.* at 512 n.12. For the same reason, Article III does not require Citizens to prove how the Census Bureau would have implemented the Amendment in a "counterfactual world." *See id.*

Because Article III does not require plaintiffs to prove counterfactual outcomes, Citizens need not show that complying with the Constitution's required process would restore New York's or Pennsylvania's (or Virginia's) seats. *See id.* They demonstrated redressability for the remand and mandamus relief they request.

66

b. Vacatur would redress Citizens' injuries.

Regardless of the possibilities that could occur on remand, Citizens have also proven redressability because, if they succeed on their claims, as this Court must assume they will, a court can set aside the Report as the APA requires. *See* 5 U.S.C. § 706(2)(D) ("The reviewing court shall— (2) hold unlawful and *set aside agency action* . . . . without observance of procedure required by law" (emphasis added)); *Akins*, 524 U.S. at 25 ("If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case . . . ."). Setting aside (vacating) an agency action qualifies as sufficient redress for Article III standing when it would cure the injury. *Bennett v. Spear*, 520 U.S. 154, 171 (1997); *but see* App-173 ("[Vacatur] can't be adequate.").

Setting aside the Report as illegal would restore the 2010 apportionment and the lost seats to New York and Pennsylvania. *See Action on Smoking and Health v. C.A.B*, 713 F.2d 795, 797 (D.C. Cir. 1983) (per curiam) (vacating an agency decision has "the effect of reinstating the [decision] previously in force"). Continuing a prior apportionment has happened before. During the 1920s, when Congress could not agree on another apportionment, the United States did just

67

that: it continued using the 1910 apportionment. *Franklin v. Massachusetts*, 505 U.S. at 791-92.

For this standing analysis, this Court will assume the Report is unconstitutional. *See Ted Cruz for Senate*, 142 S. Ct. at 1647-48 ("For standing purposes, we accept as valid the merits of appellees' legal claims"). The APA lets courts vacate unconstitutional agency action. *See* Tr. 35, *United States v. Texas*, No. 22-58 (2023 (Roberts, C.J.) (Nov. 29, 2022) ("those of us who were on the D.C. Circuit, you know, five times before breakfast, [vacate is] what you do in an APA case."), supremecourt.gov/oral_arguments/argument_transcripts/2022/22-58_4fc4.pdf. That routine APA remedy would redress Citizens' vote-dilution injuries by restoring their seats. Thus, Citizens also demonstrated redressability for the vacatur remedy they seek.

> c. Declaratory and injunctive relief would redress Citizens' injuries.

Citizens also seek declaratory and injunctive relief to redress their vote-dilution injuries. *See Franklin v. Massachusetts*, 505 U.S. at 803 ("For purposes of establishing standing . . . the [malapportionment] injury alleged is likely to be redressed by declaratory relief against the Secretary alone."). Of course, courts can enjoin the Census Bureau to

implement the Amendment and to issue a new report. *See Utah*, 536 U.S. at 461; *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("injunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally."). This relief also demonstrates redressability.

## CONCLUSION

Citizens demonstrated Article III standing. The Constitution requires reversal and remand to the district court for further proceedings.

Dated: October 30, 2023,     */s/ Jared S. Pettinato*
                              Jared S. Pettinato
                              *Attorney for Appellant*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

This brief complies with the type-volume limitations of Federal Rule of Civil Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1), it contains 12,998 words. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it uses a proportionally spaced typeface, 14-point Century Schoolbook in MS Word 365.

Dated: October 30, 2023,    */s/ Jared S. Pettinato*
Jared S. Pettinato
*Attorney for Appellant*

70

## CERTIFICATE OF SERVICE

On this day, I served Plaintiff-Appellant's Brief on the following

counsel via CM/ECF on the following counsel:

Anna O'Neill Mohan
Sarah Jane Clark
Michael S. Raab
Mark B. Stern
United States Department of Justice
Civil Division
Appellate Section
950 Pennsylvania Ave NW
Washington, DC 20530
anna.mohan@usdoj.gov
sarah.clark@usdoj.gov
Michael.Raab@usdoj.gov
Mark.Stern@usdoj.gov
civilappellate@ecf.usdoj.gov

Dated: October 30, 2023,        */s/ Jared S. Pettinato*
                               Jared S. Pettinato
                               *Attorney for Appellant*

## ADDENDUM

### I. The 14th Amendment, Section 2 states:

Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

### II. 2 U.S.C. § 2a states:

Reapportionment of Representatives; time and manner; existing decennial census figures as basis; statement by President; duty of clerk

(a) On the first day, or within one week thereafter, of the first regular session of the Eighty-second Congress and of each fifth Congress thereafter, the President shall transmit to the Congress a statement showing the whole number of persons in each State, excluding Indians not taxed, as ascertained under the seventeenth and each subsequent decennial census of the population, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method known as the method of equal proportions, no State to receive less than one Member.

(b) Each State shall be entitled, in the Eighty-third Congress and in each Congress thereafter until the taking effect of a reapportionment under this section or subsequent statute, to the number of Representatives shown in the statement required by

72

subsection (a) of this section, no State to receive less than one Member. It shall be the duty of the Clerk of the House of Representatives, within fifteen calendar days after the receipt of such statement, to send to the executive of each State a certificate of the number of Representatives to which such State is entitled under this section. In case of a vacancy in the office of Clerk, or of his absence or inability to discharge this duty, then such duty shall devolve upon the Sergeant at Arms of the House of Representatives.

(c) Until a State is redistricted in the manner provided by the law thereof after any apportionment, the Representatives to which such State is entitled under such apportionment shall be elected in the following manner:

(1) If there is no change in the number of Representatives, they shall be elected from the districts then prescribed by the law of such State, and if any of them are elected from the State at large they shall continue to be so elected;

(2) if there is an increase in the number of Representatives, such additional Representative or Representatives shall be elected from the State at large and the other Representatives from the districts then prescribed by the law of such State;

(3) if there is a decrease in the number of Representatives but the number of districts in such State is equal to such decreased number of Representatives, they shall be elected from the districts then prescribed by the law of such State;

(4) if there is a decrease in the number of Representatives but the number of districts in such State is less than such number of Representatives, the number of Representatives by which such number of districts is exceeded shall be elected from the State at large and the other Representatives from the districts then prescribed by the law of such State; or

(5) if there is a decrease in the number of Representatives and the number of districts in such State exceeds such decreased number of Representatives, they shall be elected from the State at large.

73

### III. 2 U.S.C. § 2b states:

Number of Representatives from each State in 78th and subsequent Congresses

Each State shall be entitled, in the Seventy-eighth and in each Congress thereafter until the taking effect of a reapportionment under a subsequent statute or section 2a of this title, to the number of Representatives shown in the statement transmitted to the Congress on January 8, 1941, based upon the method known as the method of equal proportions, no State to receive less than one Member.

### IV. 13 U.S.C. § 141 states:

Section 141 - Population and other census information

(a) The Secretary shall, in the year 1980 and every 10 years thereafter, take a decennial census of population as of the first day of April of such year, which date shall be known as the "decennial census date", in such form and content as he may determine, including the use of sampling procedures and special surveys. In connection with any such census, the Secretary is authorized to obtain such other census information as necessary.

(b) The tabulation of total population by States under subsection (a) of this section as required for the apportionment of Representatives in Congress among the several States shall be completed within 9 months after the census date and reported by the Secretary to the President of the United States.

(c) The officers or public bodies having initial responsibility for the legislative apportionment or districting of each State may, not later than 3 years before the decennial census date, submit to the Secretary a plan identifying the geographic areas for which specific tabulations of population are desired. Each such plan shall be developed in accordance with criteria established by the Secretary, which he shall furnish to such officers or public bodies not later than April 1 of the fourth year preceding the decennial census date. Such criteria shall include requirements which assure that such

plan shall be developed in a nonpartisan manner. Should the Secretary find that a plan submitted by such officers or public bodies does not meet the criteria established by him, he shall consult to the extent necessary with such officers or public bodies in order to achieve the alterations in such plan that he deems necessary to bring it into accord with such criteria. Any issues with respect to such plan remaining unresolved after such consultation shall be resolved by the Secretary, and in all cases he shall have final authority for determining the geographic format of such plan. Tabulations of population for the areas identified in any plan approved by the Secretary shall be completed by him as expeditiously as possible after the decennial census date and reported to the Governor of the State involved and to the officers or public bodies having responsibility for legislative apportionment or districting of such State, except that such tabulations of population of each State requesting a tabulation plan, and basic tabulations of population of each other State, shall, in any event, be completed, reported, and transmitted to each respective State within one year after the decennial census date.

(d) Without regard to subsections (a), (b), and (c) of this section, the Secretary, in the year 1985 and every 10 years thereafter, shall conduct a mid-decade census of population in such form and content as he may determine, including the use of sampling procedures and special surveys, taking into account the extent to which information to be obtained from such census will serve in lieu of information collected annually or less frequently in surveys or other statistical studies. The census shall be taken as of the first day of April of each such year, which date shall be known as the "mid-decade census date".

(e)

(1) If-

(A) in the administration of any program established by or under Federal law which provides benefits to State or local governments or to other recipients, eligibility for or the amount of such benefits

75

would (without regard to this paragraph) be determined by taking into account data obtained in the most recent decennial census, and

(B) comparable data is obtained in a mid-decade census conducted after such decennial census,

then in the determination of such eligibility or amount of benefits the most recent data available from either the mid-decade or decennial census shall be used.

(2) Information obtained in any mid-decade census shall not be used for apportionment of Representatives in Congress among the several States, nor shall such information be used in prescribing congressional districts.

(f) With respect to each decennial and mid-decade census conducted under subsection (a) or (d) of this section, the Secretary shall submit to the committees of Congress having legislative jurisdiction over the census-

(1) not later than 3 years before the appropriate census date, a report containing the Secretary's determination of the subjects proposed to be included, and the types of information to be compiled, in such census;

(2) not later than 2 years before the appropriate census date, a report containing the Secretary's determination of the questions proposed to be included in such census; and

(3) after submission of a report under paragraph (1) or (2) of this subsection and before the appropriate census date, if the Secretary finds new circumstances exist which necessitate that the subjects, types of information, or questions contained in reports so submitted be modified, a report containing the Secretary's determination of the subjects, types of information, or questions as proposed to be modified.

(g) As used in this section, "census of population" means a census of population, housing, and matters relating to population and housing.

**V. Section 209, Act of Nov. 26, 1997 § 209, Pub. L. No. 105-119, 111 Stat. 2440, 2481 (codified at 13 U.S.C. § 141 note), states:**

(a) Congress finds that-

(1) it is the constitutional duty of the Congress to ensure that the decennial enumeration of the population is conducted in a manner consistent with the Constitution and laws of the United States;

(2) the sole constitutional purpose of the decennial enumeration of the population is the apportionment of Representatives in Congress among the several States;

(3) section 2 of the 14th article of amendment to the Constitution clearly states that Representatives are to be 'apportioned among the several States according to their respective numbers, counting the whole number of persons in each State';

(4) article I, section 2, clause 3 of the Constitution clearly requires an 'actual Enumeration' of the population, and section 195 of title 13, United States Code, clearly provides 'Except for the determination of population for purposes of apportionment of Representatives in Congress among the several States, the Secretary shall, if he considers it feasible, authorize the use of the statistical method known as "sampling" in carrying out the provisions of this title.';

(5) the decennial enumeration of the population is one of the most critical constitutional functions our Federal Government performs;

(6) it is essential that the decennial enumeration of the population be as accurate as possible, consistent with the Constitution and laws of the United States;

(7) the use of statistical sampling or statistical adjustment in conjunction with an actual enumeration to carry out the census with respect to any segment of the population poses the risk of an inaccurate, invalid, and unconstitutional census;

(8) the decennial enumeration of the population is a complex and vast undertaking, and if such enumeration is conducted in a manner that does not comply with the requirements of the Constitution or laws of the United States, it would be impracticable for the States to obtain, and the courts of the United States to provide, meaningful relief after such enumeration has been conducted; and

(9) Congress is committed to providing the level of funding that is required to perform the entire range of constitutional census activities, with a particular emphasis on accurately enumerating all individuals who have historically been undercounted, and toward this end, Congress expects-

(A) aggressive and innovative promotion and outreach campaigns in hard-to-count communities;

(B) the hiring of enumerators from within those communities;

(C) continued cooperation with local government on address list development; and

(D) maximized census employment opportunities for individuals seeking to make the transition from welfare to work.

(b) Any person aggrieved by the use of any statistical method in violation of the Constitution or any provision of law (other than this Act [see Tables for classification]), in connection with the 2000 or any later decennial census, to determine the population for purposes of the apportionment or redistricting of Members in Congress, may in a civil action obtain declaratory, injunctive, and any other appropriate relief against the use of such method."(c) For purposes of this section-

(1) the use of any statistical method as part of a dress rehearsal or other simulation of a census in preparation for the use of such method, in a decennial census, to determine the population for purposes of the apportionment or redistricting of Members in Congress shall be considered the use of such method in connection with that census; and

78

(2) the report ordered by title VIII of Public Law 105-18 [111 Stat. 217] and the Census 2000 Operational Plan shall be deemed to constitute final agency action regarding the use of statistical methods in the 2000 decennial census, thus making the question of their use in such census sufficiently concrete and final to now be reviewable in a judicial proceeding.

(d) For purposes of this section, an aggrieved person (described in subsection (b)) includes-

(1) any resident of a State whose congressional representation or district could be changed as a result of the use of a statistical method challenged in the civil action;

(2) any Representative or Senator in Congress; and

(3) either House of Congress.

(e)

(1) Any action brought under this section shall be heard and determined by a district court of three judges in accordance with section 2284 of title 28, United States Code. The chief judge of the United States court of appeals for each circuit shall, to the extent practicable and consistent with the avoidance of unnecessary delay, consolidate, for all purposes, in one district court within that circuit, all actions pending in that circuit under this section. Any party to an action under this section shall be precluded from seeking any consolidation of that action other than is provided in this paragraph. In selecting the district court in which to consolidate such actions, the chief judge shall consider the convenience of the parties and witnesses and efficient conduct of such actions. Any final order or injunction of a United States district court that is issued pursuant to an action brought under this section shall be reviewable by appeal directly to the Supreme Court of the United States. Any such appeal shall be taken by a notice of appeal filed within 10 days after such order is entered; and the jurisdictional statement shall be filed within 30 days after such order is entered. No stay of an order issued pursuant to an action

brought under this section may be issued by a single Justice of the Supreme Court.

(2) It shall be the duty of a United States district court hearing an action brought under this section and the Supreme Court of the United States to advance on the docket and to expedite to the greatest possible extent the disposition of any such matter.

(f) Any agency or entity within the executive branch having authority with respect to the carrying out of a decennial census may in a civil action obtain a declaratory judgment respecting whether or not the use of a statistical method, in connection with such census, to determine the population for the purposes of the apportionment or redistricting of Members in Congress is forbidden by the Constitution and laws of the United States.

(g) The Speaker of the House of Representatives or the Speaker's designee or designees may commence or join in a civil action, for and on behalf of the House of Representatives, under any applicable law, to prevent the use of any statistical method, in connection with the decennial census, to determine the population for purposes of the apportionment or redistricting of Members in Congress. It shall be the duty of the Office of the General Counsel of the House of Representatives to represent the House in such civil action, according to the directions of the Speaker. The Office of the General Counsel of the House of Representatives may employ the services of outside counsel and other experts for this purpose.

(h) For purposes of this section and section 210 [formerly set out below]-

(1) the term 'statistical method' means an activity related to the design, planning, testing, or implementation of the use of representative sampling, or any other statistical procedure, including statistical adjustment, to add or subtract counts to or from the enumeration of the population as a result of statistical inference; and

(2) the term 'census' or 'decennial census' means a decennial enumeration of the population.

(i) Nothing in this Act shall be construed to authorize the use of any statistical method, in connection with a decennial census, for the apportionment or redistricting of Members in Congress.

(j) Sufficient funds appropriated under this Act or under any other Act for purposes of the 2000 decennial census shall be used by the Bureau of the Census to plan, test, and become prepared to implement a 2000 decennial census, without using statistical methods, which shall result in the percentage of the total population actually enumerated being as close to 100 percent as possible. In both the 2000 decennial census, and any dress rehearsal or other simulation made in preparation for the 2000 decennial census, the number of persons enumerated without using statistical methods must be publicly available for all levels of census geography which are being released by the Bureau of the Census for:

(1) all data releases before January 1, 2001;

(2) the data contained in the 2000 decennial census Public Law 94-171[amending this section] data file released for use in redistricting;

(3) the Summary Tabulation File One (STF-1) for the 2000 decennial census; and

(4) the official populations of the States transmitted from the Secretary of Commerce through the President to the Clerk of the House used to reapportion the districts of the House among the States as a result of the 2000 decennial census. Simultaneously with any other release or reporting of any of the information described in the preceding sentence through other means, such information shall be made available to the public on the Internet. These files of the Bureau of the Census shall be available concurrently to the release of the original files to the same recipients, on identical media, and at a comparable price. They shall contain the number of persons enumerated without using statistical methods and any additions or subtractions thereto.

These files shall be based on data gathered and generated by the Bureau of the Census in its official capacity.

(k) This section shall apply in fiscal year 1998 and succeeding fiscal years.

## VI. 5 U.S.C. § 702 states:

Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

## VII. 5 U.S.C. § 706 states:

Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall-

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be-

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.