# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued April 11, 2024      Decided September 10, 2024

No. 23-5140

CITIZENS FOR CONSTITUTIONAL INTEGRITY,
APPELLANT

v.

CENSUS BUREAU, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cv-03045)

---

*Jared S. Pettinato* argued the cause and filed the briefs for appellant.

*Sarah J. Clark*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Mark B. Stern* and *Michael S. Raab*, Attorneys. *Anna O. Mohan*, Attorney, entered an appearance.

Before: SRINIVASAN, *Chief Judge*, WILKINS and CHILDS, *Circuit Judges*.

2

Opinion for the Court filed by *Circuit Judge* WILKINS.

Concurring opinion filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*:  Section 2 of the Fourteenth Amendment, which specifies that seats in the House of Representatives "shall be apportioned among the several States according to their respective numbers," also provides that the "basis of representation" for the apportionment of representatives to any state "shall be reduced" proportionately "when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged."  U.S. CONST. amend. XIV, § 2.[1]  This constitutional provision, dubbed the Reduction Clause or the Penalty Clause, has been historically neglected save for a handful of efforts by members of Congress and intrepid plaintiffs to enforce it.  *See* George David Zuckerman, *A Consideration of the History and Present Status of Section 2 of the Fourteenth Amendment*, 30 FORDHAM L. REV. 93, 107–24 (1961); *see also Lampkin v. Connor*, 360 F.2d 505 (D.C. Cir. 1966).

Enter Appellant Citizens for Constitutional Integrity ("Citizens"), a non-profit organization with members in New York, Pennsylvania, and Virginia.  Seeking to enforce the

---

[1] "[T]he reference in this provision to 'male inhabitants . . . being twenty-one years of age' has been superseded by the Nineteenth and Twenty-sixth Amendments" and the provision is read to encompass those that are "*eligible*" to vote now.  *Evenwel v. Abbott*, 578 U.S. 54, 102 n.7 (2016) (Alito, J., concurring in judgment) (emphasis in original).

3

Reduction Clause, Citizens sued the Census Bureau, the Department of Commerce, the Secretary of Commerce (the "Secretary"), in her official capacity, and the Census Bureau Director, in his official capacity, (hereinafter referred to together as the "Bureau") over their collective failure to proportionately reduce the basis of representation for each of the 50 states when tabulating 2020 Census data in order to calculate the apportionment of representatives as part of the Bureau's statutorily mandated report to the President.  In its complaint, Citizens asserted an Administrative Procedure Act ("APA") claim and a mandamus claim, alleging that the Bureau, by ignoring the Reduction Clause in the apportionment calculations that it turned over to the President, flouted its constitutional and attendant statutory responsibilities; unconstitutionally deprived New York, Pennsylvania, and Virginia of congressional representation; and impermissibly diluted the power of Citizens's members in those states.

A three-judge panel in the District Court dismissed Citizens's challenge for lack of standing.  Citizens now appeals that ruling.  Because Citizens is unable to establish that its vote dilution injury is traceable to the alleged deficiencies in the Secretary's report, it is necessarily unable to establish Article III standing with respect to that injury.  Accordingly, we affirm.

**I.**

**A.**

Representatives are apportioned "among the several [s]tates" according to the "actual [e]numeration[,]" or population, for each state.  U.S. CONST. art. I, § 2.  Specifically, Article I, Section 2 of the Constitution provides that the number of representatives "shall be determined by adding to the whole Number of free Persons, including those bound to Service for

4

a Term of Years, and excluding Indians not taxed, three fifths of all other Persons." *Id.* The aforementioned "other persons" was a euphemism for persons of African descent, who were only fractionally represented in the House of Representatives because the framers of the original Constitution "view[ed] them in the mix[ed] character of persons and of property," THE FEDERALIST NO. 54, at 276 (James Madison) (Bantam Books 1982), and did not consider them worthy of United States citizenship, *see Dred Scott v. Sandford*, 60 U.S. 393, 419–20 (1857). Following the Civil War, Congress passed the Fourteenth Amendment to declare that all persons born in the United States, including those of African descent, are United States citizens, U.S. CONST. amend. XIV, § 1, and to provide "adequate security for future peace and safety" before the Confederate states were to be again "entitled to representation" in Congress, J. COMM. ON RECONSTRUCTION, 39TH CONG., 1ST. SESS., REP. OF J. COMM. ON RECONSTRUCTION 15 (Comm. Print 1866). Section 2 of the Fourteenth Amendment modified the then-existing apportionment procedure in Article I, including its ignominious three-fifths clause, providing the following in full:

> Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial offices of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion,

5

> or other crime, the basis of representation
> therein shall be reduced in the proportion which
> the number of such male citizens shall bear to
> the whole number of male citizens twenty-one
> years of age in such State.

U.S. CONST. amend. XIV, § 2; *see Evenwel*, 576 U.S. at 102
n.7 (Alito, J., concurring in judgment).

Today, the "actual [e]numeration" of the apportionment
population is ascertained through the decennial census, which
is administered by Congress in the manner that body by law
directs. U.S. CONST. art. I, § 2. Congress, in turn, has delegated
the census administration responsibility to the Secretary with
broad implementation discretion. 13 U.S.C. § 141(a). Once
the decennial census is complete, the Secretary is charged with
"tabulat[ing] . . . [the] total population by States under [Section
141(a)] as required for the apportionment of Representatives,"
to be "reported by the Secretary to the President of the United
States." 13 U.S.C. § 141(b). The President then "transmit[s]
to the Congress a statement showing the whole number of
persons in each State . . . as ascertained under the . . . decennial
census" and "the number of Representatives to which each
State would be entitled under an apportionment of the then-
existing number of Representatives by the method known as
the method of equal proportions." 2 U.S.C. § 2a(a).

Congress set the number of Representatives at 435 in the
Apportionment Act of 1911. Act of Aug. 8, 1911, Pub. L. No.
62–5, §§ 1–4, 37 Stat. 13–14 (1911). The calculation of the
apportionment of those 435 seats occurs in two steps. First, per
the Constitution, each state receives one seat, leaving 385 seats
to be distributed. U.S. CONST. art. 1, § 2. Second, "seats 51
through 435" are awarded according to the method of equal
proportions, which is a "mathematically determined priority

6

listing of states . . . . [that] results in a listing of the states according to a priority value—calculated by dividing the population of each state by the geometric mean of its current and next seats." *About Congressional Apportionment*, U.S. CENSUS BUREAU (Nov. 22, 2021), https://www.census.gov/topics/public-sector/congressional-apportionment/about.html [perma.cc/6465-FARL]. That method works by first calculating the multipliers for each additional seat—where the second seat multiplier is $\frac{1}{\sqrt{2(2-1)}}$ or .70710678, the third seat multiplier is $\frac{1}{\sqrt{3(3-1)}}$ or .40824829, the fourth seat multiplier is $\frac{1}{\sqrt{4(4-1)}}$ or .288675134, and so on— until the appropriate number of multipliers have been calculated. *Computing Apportionment*, U.S. CENSUS BUREAU (Nov. 22, 2021), https://www.census.gov/topics/public-sector/congressional-apportionment/about/computing.html [perma.cc/WKH6-HDRF]. These multipliers are then each multiplied by the total apportionment population for each of the 50 states, which results in a list of "priority values" that are then ordered from highest to lowest value. *Id.* Finally, the remaining seats are assigned according to the resulting priority values, starting with the 51st seat, until all remaining seats are assigned.[2] *Id.*

---

[2] The 2020 Census apportionment provides a concrete example of how the method of equal proportions works. For the 2020 apportionment, the Bureau assigned the 51st seat to California because, after multiplying the second seat multiplier (.70710678) by California's apportionment population, the priority value (27984993.2520723) was higher than any other state's priority value in the list. A. 57. The Bureau then assigned the 52nd seat to Texas after multiplying the second seat multiplier by Texas's apportionment population, which resulted in a priority value of 20635702.2563336. *Id.* The Bureau then assigned the 53rd seat to

7

**B.**

On April 26, 2021, in accordance with Section 141(b), the Secretary sent President Biden a statement showing the "apportionment population for each of the 50 states on April 1, 2020" (the "Report"), as ascertained by the 2020 Census. A. 165.  The Report listed three values for each state:  (1) the apportionment population, (2) the number of apportioned representatives based on the 2020 Census and calculated according to the method of equal proportions, and (3) the change in apportioned representatives between the 2020 apportionment and the previous apportionment based on the 2010 Census.  Compared to the 2010 apportionment, the 2020 apportionment reduced the number of representative seats for New York and Pennsylvania by one each and maintained the same number of seats for Virginia.

Nearly six months after the Secretary sent the President the Report, Citizens sued the Bureau on behalf of its members in New York, Pennsylvania, and Virginia to challenge the issuance of the Report, theorizing that, by failing to proportionately "discount . . . [the] basis of representation" for each state based on the number of voters denied access to the vote by voter registration and voter identification laws, the Bureau had unconstitutionally deprived voters in those three states of congressional representation and diluted the power of Citizens's members in those same three states.   A. 146. Citizens raised two claims in connection with this theory.  In the first, Citizens alleged that the Bureau's issuance of the Report to the President was arbitrary, capricious, and otherwise

---

California because the priority value (16157143.3873536) that resulted from multiplying the third seat multiplier (.40824829) by California's apportionment population was still higher than any other state's apportionment population multiplied by the second seat multiplier.  *Id.*

8

contrary to law in violation of the APA because, in failing to implement the Reduction Clause, the Bureau had failed to "consider an important aspect of the problem" or otherwise misinterpreted the law. *Id.* (quoting *Motor Vehicle Mfrs.' Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). In the second, Citizens urged that the Bureau's alleged Fourteenth Amendment violation compelled a writ of mandamus to remedy its injury.

To support its theory of injury, Citizens submitted a declaration from a data scientist "that purported to demonstrate what apportionment would look like if the Bureau had accounted for state voter-registration requirements and voter-ID laws." *Citizens for Const. Integrity v. Census Bureau*, 669 F. Supp. 3d 28, 33 (D.D.C. 2023). To show this, the declarant calculated the distribution of seats in the House of Representatives that would have followed if the basis of representation for different states had been adjusted to account for certain populations denied access to the vote because of such laws and requirements. The first scenario tested the declarant's algorithm by replicating the Bureau's application of the method of equal proportions in the Report and resulted in an exact replication of the 2020 Census apportionment count. The second scenario replaced the actual population enumeration from the 2020 Census the Bureau had used for the apportionment population value with a "basis of representation" value. A. 46. The declarant calculated the latter value by multiplying "the proportion of citizens who can vote"—which the declarant calculated as a ratio of citizens that can vote and citizens who cannot register because of a criminal conviction to the total number of citizens—and "the Census's actually enumerated population statistic." *Id.* In that scenario, as compared to the Report, New York lost a seat, Pennsylvania received the same number of seats, and Virginia gained a seat. For the third scenario, the declarant kept almost all values from

9

the first scenario but only replaced the value the Bureau used for Wisconsin with a basis of representation that reduced the "proportion of citizens who can vote" based on the number of people the declarant determined had been disenfranchised by the state's voter photo identification law.  In the third scenario, the declarant found Wisconsin would have lost a seat while New York would have gained a seat.  Finally, for the fourth scenario, the declarant mimicked his calculation for the second scenario but also reduced Wisconsin's basis of representation alone based on the number of voters impacted by the state's voter photo identification law.  In this last scenario, the declarant concluded that Wisconsin and New York each would have lost a seat, but Pennsylvania and Virginia each would have gained a seat.

The District Court panel dismissed Citizens's challenge for lack of Article III standing.  *Citizens for Const. Integrity*, 669 F. Supp. 3d at 30.  The panel concluded that Citizens fell short of demonstrating an injury that was traceable to the Bureau's failure to apply the Reduction Clause.  *Id.*  To satisfy the traceability requirement, the District Court explained, Citizens needed to "show that their states would have had an additional representative but for the government's error." *Id.* at 32.  On the District Court's read, "pointing out the government's alleged failure to follow the Reduction Clause" was not enough because that, without more, "does not mean that a corrected recount would lead to an apportionment more favorable to the plaintiff." *Id.*  The District Court further found the data scientist's declaration unpersuasive because it did not "even attempt to approximate the number of citizens in each state who have been disenfranchised by voter-ID requirements" and "fail[ed] to provide [the District Court] with a scenario that illustrates what apportionment might look like if Citizens's legal theory is correct." *Id.* at 33.

10

Responding to Citizens's argument below that it need not "show what apportionment would look like under its legal theory" because the traceability and redressability requirements are relaxed in procedural rights cases, *id.* at 34, the District Court held that the Reduction Clause does not establish a procedural right to which Citizens is entitled or for which Citizens's required showing for traceability or redressability would be relaxed, *id.* at 35.

Citizens timely appealed, raising three arguments. It argues, first, that it demonstrated a concrete vote dilution injury. Next, it contends that the Report caused that injury. Finally, it urges that it has proven that a new Report could redress its injury, particularly under the relaxed procedural injury standing burden for traceability and redressability. Citizens invoked the subject matter jurisdiction of the District Court pursuant to 28 U.S.C. §§ 1331 and 1361, as well as the Act of November 26, 1997, Pub. L. No. 105-119, § 209, 111 Stat. 2440, 2481. We review the District Court's dismissal for lack of standing *de novo*. *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).

**II.**

In general, the "irreducible constitutional minimum of [Article III] standing" requires a plaintiff to demonstrate: "(1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.*

11

at 339 (quoting *Lujan*, 504 U.S. at 560).  We address each of Citizens's claims in turn.

**A.**

**i.**

Taking the first claim first, Citizens challenged the Bureau's issuance of the Report before the District Court under three different sections of the APA:  Section 706(2)(A), which permits us to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); Section 706(2)(B), which permits us to do the same when an agency action is "contrary to constitutional right, power, privilege, or immunity," *id.* § 706(2)(B); and, finally, Section 706(2)(D), which instructs us to set aside agency action found to be "without observance by procedure required by law," *id.* § 706(2)(D).  *See* A. 137, 147.  On appeal, Citizens homes in on Section 706(2)(D) in particular to assert that, where an agency fails to observe a "*procedure required by law*," there is a "procedural right to [levy a] claim [against] an agency." Appellant's Br. at 19 (emphasis in original).

Classifying this action as a procedural-rights case is important to Citizens because, in such cases, "[a] litigant may establish Article III jurisdiction without meeting the usual 'standards for redressability and immediacy.'" *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (quoting *Lujan*, 504 U.S. at 572 n.7); *see also Ctr. for Biological Diversity v. Env't Prot. Agency*, 861 F.3d 174, 182 (D.C. Cir. 2017) ("In a case alleging a procedural injury, we 'relax the redressability and imminence requirements' for standing." (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013))).  Plaintiffs in procedural-rights cases may proceed under the relaxed

12

standard when "a statute affords [the] litigant 'a procedural right to protect his concrete interests.'" *Brown*, 600 U.S. at 561 (quoting *Lujan*, 504 U.S. at 572 n.7). Usually, this standard is applied in cases where a plaintiff has pleaded a procedural injury, and thus "must show *both* (1) that their procedural right has been violated, *and* (2) that the violation of that right has resulted in an invasion of their concrete and particularized interest" in order to demonstrate their procedural injury meets Article III muster. *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1159 (D.C. Cir. 2005) (emphasis in original). Here, however, the typical two-step procedural injury inquiry is irrelevant because we are not being asked to determine whether Citizens's claimed procedural injury suffices as an injury for Article III purposes; instead, since Citizens's claimed vote dilution injury is substantive, we are being asked to determine whether the procedural deficiency Citizens alleges transforms this action into a procedural-rights case.

We hold that it does not. There is no established test in this Circuit for determining whether a claimed right is procedural or not, but the inquiry for ascertaining whether a rule qualifies for the APA's "procedural exception" to notice and comment requirements is instructive here. *AFL-CIO v. NLRB*, 57 F.4th 1023, 1034 (D.C. Cir. 2023); *see* 5 U.S.C. § 553(b)(A). Under that inquiry, "[w]e treat rules as procedural if they are 'primarily directed toward improving the efficient and effective operations of an agency.'" *AFL-CIO*, 57 F.4th at 1034 (quoting *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014)). "The critical feature" of a procedural rule "is that it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency." *Id.* (quoting *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 280 (D.C. Cir. 2000)). A rule that imposes "substantive burden[s]," *Am. Hosp. Ass'n v. Bowen*,

13

834 F.2d 1037, 1052 (D.C. Cir. 1987), "encodes a substantive value judgment," *Pub. Citizen v. Dep't of State*, 276 F.3d 634, 640 (D.C. Cir. 2002) (quoting *Am. Hosp. Ass'n*, 834 F.2d at 1047), "trenches on substantial private rights [or] interests," *Mendoza*, 754 F.3d at 1023 (quoting *Batterton v. Marshall*, 648 F.2d 694, 708 (D.C. Cir. 1980)), or otherwise "alter[s] the rights or interests of the parties," *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) (quoting *Glickman*, 229 F.3d at 280), is not procedural for Section 553 purposes. *See AFL-CIO*, 57 F.4th at 1034–35.

Adopting here the qualifications used to determine whether a rule is procedural, we cannot categorize Citizens's challenge as concerning a procedural right. The "agency action" that Citizens challenges is the Bureau's issuance of the Report. The heart of that challenge is substantive; Citizens does not challenge the issuance of the Report from an "operation[al]" standpoint, *AFL-CIO*, 57 F.4th at 1034, but instead goes after the Bureau's alleged failure to take certain substantive considerations into account when conducting the analysis for the Report, which analysis involves "substantive value judgment[s]," *Pub. Citizen*, 276 F.3d at 640. Moreover, Citizens's claimed vote dilution injury itself is a concession that the organization's concern about the Report is related to its impact on "the rights and interests" of the organization and its members. *AFL-CIO*, 57 F.4th at 1034.

Our conclusion is consistent with the reasoning of the Court in *National Association of Home Builders v. Defenders of Wildlife*. 551 U.S. 644 (2007). There, the Court construed Section 7(a)(2) of the Endangered Species Act, which provides that "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary . . . insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize" endangered or threatened species or their

14

habitats. *Id.* at 652 (quoting 16 U.S.C. § 1536(a)(2)).  In doing so, the Court explained that the language of Section 7(a)(2) requiring agency "consultation" with the Secretary was a procedural requirement, while the language requiring the agency to "insure that any action . . . is not likely to jeopardize" an endangered species was "substantive."  *Id.* at 661–62; *see also id.* at 667 (Section 7(a)(2) "imposes a substantive (and not just a procedural) statutory requirement"); *id.* at 693 n.13 (Stevens, J., dissenting) (agreeing that Section 7(a)(2) of the Endangered Species Act contains a "substantive requirement").

The substantive nature of Citizens's challenge is further betrayed by the cases it cites in its complaint, all of which concern review of substantive agency actions.  First, Citizens alleges that the Bureau violated the APA by failing to "implement the Fourteenth Amendment," A. 146, and cites to *State Farm* for its disapproval of agency action caused by an agency that "entirely failed to consider an important aspect of the problem," 463 U.S. at 43.  But in that case, the Supreme Court held that failure to consider an "important aspect of the problem" was cause for a court to deem an "agency rule . . . arbitrary and capricious." *Id.*  Arbitrary and capricious review under Section 706(2)(A) is inherently designed for review of substantive agency actions and, by relying on *State Farm*, Citizens functionally concedes that review of the substantive content of the Report is what the organization seeks.

Next, Citizens relies on *NLRB v. Brown*, 380 U.S. 278 (1965), and *SEC v. Chenery*, 318 U.S. 80 (1943), to support its allegation that the Bureau's "misinterpret[ation]" of the Fourteenth Amendment violates the APA.  A. 146.  In *NLRB v. Brown*, however, the Supreme Court concluded that courts must "set aside . . . decisions which rest on an erroneous legal foundation" as part of its reasoning in reviewing a substantive

15

agency determination about whether a party's conduct "carried . . . [the] badge of improper motive." 380 U.S. 278, 292 (1965) (internal quotation omitted). Similarly, the *Chenery* declaration that "an order may not stand if the agency has misconceived the law" was made as part of concluding that judicial review of agency conduct "requires that the grounds upon which the administrative agency acted [be] . . . clearly disclosed and adequately sustained"—a plea for agencies to make plain their substantive bases for decisionmaking. 318 U.S. 80, 94 (1943).

**ii.**

Citizens is adamant that it presents a procedural-rights challenge that should be evaluated under the relaxed Article III standard. The organization objects to the District Court's holding that Citizens was "never *entitled* to a procedure" under the Reduction Clause, calling the determination erroneous because the District Court failed to apply the zone of interests test. Appellant's Br. 47 (quoting *Citizens for Const. Integrity*, 669 F. Supp. 3d at 35) (emphasis in original). Citizens's argument, however, is unpersuasive because it demands application of the wrong test.

We employ the zone of interests test, which asks whether a plaintiff's alleged injuries "are 'arguably within the zone of interests to be protected or regulated by the statute,'" to ascertain whether the plaintiff may raise a particular claim. *CSL Plasma Inc. v. U.S. Customs & Border Protection*, 33 F.4th 584, 589 (D.C. Cir. 2022) (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012)); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014) ("Whether a plaintiff comes within 'the zone of interests' is an issue that requires us to determine, using traditional tools of statutory

16

interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." (citation omitted)). "[This] is a merits issue, not a jurisdictional one." *CSL Plasma*, 33 F.4th at 586.  Whether an injury is attendant to the violation of a procedural right, however, is connected to the Article III standing injury inquiry—a "threshold [jurisdictional] question" that relies on a separate assessment, as described above. *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

Moreover, *Lexmark*, which marked a sea change in how courts delineate between Article III standing and "standing" to raise a cause of action, bolsters the distinction between the Article III standing inquiry and the zone of interests test.  In that case, the Supreme Court, as Citizens acknowledges, applied the zone of interests test to determine whether plaintiffs "ha[d] a cause of action under the statute," 572 U.S. at 128, and also, importantly, recognized that "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional power to adjudicate the case," *id.* at 128 n.4 (citation omitted).  The remaining cases Citizens cites in support of this argument predate *Lexmark* and so are largely unhelpful for Citizens's point.

**B.**

**i.**

Having established that this is not a procedural-rights case that relaxes the Article III traceability and redressability requirements, we next consider whether Citizens has established traceability under the regular Article III standards. We conclude that it has not.

17

Traceability requires a showing "that the [alleged] injury was likely caused by the defendant." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). If a plaintiff cannot show that the government's action or inaction is "causally connected to the plaintiff's injury," they cannot demonstrate Article III standing. *California v. Texas*, 593 U.S. 659, 660 (2021); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). To establish traceability for a vote dilution injury occasioned by an apportionment calculation based on a faulty analysis or "inaccurate data," *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (plurality), a plaintiff must show the relevant population was improperly counted "by the [chosen] methodology *as compared to a feasible, alternative methodology*," *Nat'l Law Ctr. on Homelessness & Poverty v. Kantor*, 91 F.3d 178, 183 (D.C. Cir. 1996) (emphasis in original) (citing *Franklin*, 505 U.S. at 802 (plurality)).

Citizens's traceability showing fails because it has not shown that the populations of New York, Pennsylvania, and Virginia were improperly counted "by the [chosen] methodology as compared to a feasible, alternative methodology." *Kantor*, 91 F.3d at 183 (emphasis omitted); *see also Franklin*, 505 U.S. at 802 (plurality). The methods it does present in its declaration, which Citizens says show that "the 2020 [C]ensus harmed" Citizens's members "by taking seats from their states," Appellant's Br. 23, are not feasible alternative approaches. There is one scenario in which New York gained a seat, and another, separate scenario in which Pennsylvania and Virginia gained a seat, but those scenarios are not feasible because the declaration only accounted for Wisconsin's voter identification laws and not any voter registration or voter identification laws that are or may have been in force in New York, Pennsylvania, or Virginia. *See* A. 50, 52. By omitting any information about the voting rights landscape in these states, we are left to speculate whether voter

18

identification laws in New York, Pennsylvania, or Virginia, if accounted for in the apportionment calculation, would have revealed that those states were entitled to any more seats than the Report assigned them.  Citizens's allegations of traceability are thus not plausible because they are premised on a selective enforcement of the Reduction Clause with respect to only one state—Wisconsin—whereas, in reality, New York, Pennsylvania, and Virginia could also be affected if their voter registration and voter identification laws were scrutinized in the same manner.  *Cf. Bush v. Gore*, 531 U.S. 98, 110 (2000) (halting the vote recount ordered by the Florida Supreme Court because it lacked even "some assurance that the rudimentary requirements of equal treatment and fundamental fairness" would be satisfied).

**ii.**

Citizens counters that its members would not have suffered a vote-dilution injury "[b]ut-for" the Report. Appellant's Br. 36.  On its read, the fact that the law requires (1) the Secretary to send a report to the President that includes the apportionment population, (2) the President to send a statement to Congress with the total population and the number of Representatives to which each State would be entitled, and (3) each state to be entitled to the number of Representatives shown in the President's statement, establishes Citizens's injury is traceable to the Report.  To be sure, the causal chain Citizens lays out describes how an injury *could* be caused by a report on the apportionment population from the Secretary in the abstract.  The problem Citizens faces, however, is that its factual allegations are not enough to establish that there is a comparable "feasible, alternative methodology" that would have produced a different result.  *Kantor*, 91 F.3d at 183. Because Citizens, as explained, did not take into account the voter registration and voter identification laws of New York,

19

Pennsylvania, or Virginia, Citizens has failed to provide that kind of "feasible, alternative methodology." Without the entire story before us we cannot conclude from Citizens's allegations that its injury is plausibly connected to the Bureau's failure to incorporate the Reduction Clause into its methodology.

Citizens further urges that *Kantor* does not apply here because that case did not involve a plaintiff asserting that a new agency action reduced their states' apportionment compared to the prior apportionment. Instead, Citizens asserts that *Swann v. Adams*, 385 U.S. 440 (1967), controls the test for malapportionment standing, and reads it to only require a plaintiff to provide a plan "that [is] . . . closer to the legal ideal than" the existing plan. Appellant's Br. 64. *Swann*, however, concerned the degree of population variation in state legislative district apportionment that was constitutionally permissible and has no discernible bearing on Citizens's Fourteenth Amendment apportionment claims, upon which the holding in *Kantor* was based.

Next, Citizens contends that all that is necessary to prove traceability is recognizing that the Report reduces the seat allocation for New York and Pennsylvania. Citizens compares itself to the plaintiff in *U.S. Dep't of Commerce v. Montana*, 503 U.S. 442 (1992), to support its point. In that case, the State of Montana challenged the constitutionality of the method of equal proportions and the Supreme Court considered "[t]he application of the method of equal proportions to the 1990 census [to have] caused . . . 13 States to lose" seats in the House of Representatives. *Id.* at 445. Citizens is correct that it alleges a vote dilution injury and that the Report recorded the reduction in the seat allocations for New York and Pennsylvania. *See* Appellant's Br. 37. But this case diverges from *Montana*. There, the plaintiff challenged a wrongly implemented formula and so could more easily trace the injury

20

to that formula. Montana's evidence demonstrated that it would have received an additional representative if the Bureau had used its preferred method of apportionment rather than the method of equal proportions. *Id.* at 460–61. Thus, Montana clearly proved traceability based on its claim that the Bureau was required to employ the alternative method of apportionment. Here, while the Report reduces the seat allocation for New York and Pennsylvania, that does not meaningfully demonstrate that another methodology that incorporated the Reduction Clause would have, if uniformly applied, rendered a different result.

Finally, and more generally, Citizens goes for the Hail Mary, arguing that it is inherently entitled to standing because it challenges the Secretary's census methodology. To make this argument, Citizens relies on *Utah v. Evans*, which held that Utah had standing to challenge the Secretary's 2000 Census methodology as legally improper. *See* 536 U.S. 452, 460–61 (2002). *Utah*, however, is not helpful to Citizens because, in that case, the Court noted that the parties agreed that the challenged census practice (referred to as "imputation") caused Utah to receive one less Representative than it would have received if the practice had not been used. *Id.* at 458. In other words, the evidence in *Utah* demonstrated traceability in a manner not present here.

Since we dispose of this claim on traceability grounds, we need not address the Bureau's broader arguments about whether Citizens's APA claim is redressable. Moreover, since "standing is not dispensed in gross" and plaintiffs "must demonstrate standing for each claim [they] seek[] to press and for each form of relief that is sought," we note that the foregoing Article III standing analysis applies equally to Citizens's mandamus claim. *Town of Chester v. Laroe Ests.,*

21

*Inc.*, 581 U.S. 433, 439 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)).

\* \* \* \* \*

For the foregoing reasons, we affirm the District Court.

*So ordered.*

WILKINS, *Circuit Judge*, concurring:  The Fourteenth Amendment was adopted in 1866 and ratified in 1868—over 150 years ago.  CONG. GLOBE, 39th Cong., 1st Sess. 3149 (1866); *see also* Act of July 28, 1868, 15 Stat. 708–10 (1868) (ratifying the Fourteenth Amendment).  Since then, while several other amendments to the Constitution have been robustly enforced, members of Congress and agency officials have undertaken shamefully few actions to implement the Amendment's Reduction Clause, and none have resulted in any meaningful, much less robust, enforcement of the penalty contemplated by that provision.  George David Zuckerman, *A Consideration of the History and Present Status of Section 2 of the Fourteenth Amendment*, 30 FORDHAM L. REV. 93, 107–24 (1961).

In this case, the Bureau argued that Citizens's claims are not redressable because the Bureau "neither [has] the authority nor the tools" to implement the Reduction Clause and because "it is far from clear that [the Secretary] would have authority to withdraw her [R]eport on the 2020 census at this point."  Appellee's Br. 20–21; *see* Oral Argument Tr. 21–22.  At argument, the Bureau was asked how, under its theory, any plaintiff would have standing to enforce the Reduction Clause.  *Id.* at 23–24.  "I'm not sure," replied counsel for the Bureau, "[i]t's not clear because of the way that the [R]eduction [C]lause and the statutory scheme exist . . . there is no obvious . . . answer to that question."  *Id.* at 23.  When pressed further about which government actor is responsible for enforcing the Reduction Clause, if not the Bureau, the Bureau took no position, abdicating any responsibility for implementing the provision without some other congressional action.  *Id.* at 26–28.  The Bureau's response, put colloquially, was, "Not it."

This is an unacceptable position from an agency of the Executive Branch that is tasked with the responsibility, and empowered with the authority, to "take [c]are that the [l]aws be

2

faithfully executed." U.S. CONST. art. II, § 3. The Reduction Clause, which has been codified in statute since 1872, is just as important as any other constitutional provision, having been passed following intense deliberations about how to reunite a nation fractured by war and facing political differences that threatened to leave four million formerly enslaved Black Americans with "no political existence" while Southerners gained a profound increase in political power. W.E.B. DU BOIS, BLACK RECONSTRUCTION 290 (Free Press 1998) (1935); *see id.* at 295, 330. Equal treatment must be afforded not just to people but to the laws in place to protect their rights; it is high time, after 150 years, that the Reduction Clause receive the respect it deserves.

**I.**

Following the Civil War, the Joint Committee on Reconstruction (the "Committee") was tasked with "inquir[ing] into the condition of the [Confederate] States . . . and report[ing] whether they or any of them are entitled to be represented in either house of Congress." J. COMM. ON RECONSTRUCTION, 39TH CONG., 1ST SESS., REP. OF J. COMM. ON RECONSTRUCTION 1 (Comm. Print 1866). The Committee proposed the Fourteenth Amendment based on its findings. *Id.* at 15, 29. The originally stated purpose of the Amendment was to protect "the civil rights and privileges of all citizens in all parts of the republic" and to "place representation on an equitable basis[.]" *Id.* at 15. Adoption of the Reduction Clause specifically, however, was motivated by "[t]he Republicans who controlled the 39th Congress," who "were concerned that the additional congressional representation of the Southern States which would result from the abolition of slavery might weaken [the Republicans'] own political dominance." *Richardson v. Ramirez*, 418 U.S. 24, 73 (1974) (Marshall, J., dissenting). The omission of any mention

3

of race or color in the final version of the Reduction Clause was occasioned by a fear that, by cabining it to race-based disenfranchisement, Congress would inadvertently "enable circumvention of the congressional purpose via imposition by the states of unpenalizable education or property qualifications." Arthur Earl Bonfield, *The Right to Vote and Judicial Enforcement of Section Two of the Fourteenth Amendment*, 46 CORNELL L.Q. 108, 112 (1960). In effect, however, they put "Southern States to a choice—enfranchise Negro voters or lose congressional representation." *Richardson*, 418 U.S. at 74 (Marshall, J., dissenting); *see* H.R. REP. NO. 39-11, at 3 (1st Sess. 1866) (minority report explaining that "[t]he object of [the Fourteenth A]mendment is to establish universal and unqualified negro suffrage throughout the whole Union; and instead of boldly and openly meeting that issue, it attempts to deceive the people by inflicting a severe penalty upon the States that refuse unqualified suffrage to the colored race").

The government first sought to enforce the Reduction Clause through the 1870 Census. Senator James Harlan of Iowa proposed a resolution on December 19, 1868, directing the Senate Judiciary Committee to "prepare a bill for the apportionment of Representatives in compliance with" the Reduction Clause. Zuckerman, *supra*, at 107 (citing CONG. GLOBE, 40th Cong., 3d Sess. 158 (1868)). That resolution died on the vine when the short session of Congress that year terminated, but the House of Representatives took up the mantle soon after, appointing a Committee on the Ninth Census (the "Census Committee"), chaired by then-Representative Garfield of Ohio, to "ascertain the laws which restricted suffrage" and to "provide the census takers with this information to assist them in determining the number of adult male citizens whose right to vote was denied or abridged." *Id.*

4

at 108; *see* H.R. REP. NO. 41-3, at 52–53 (1870).  The Census
Committee concluded, in relevant part, that

> The [T]hirteenth and [F]ourteenth
> [A]mendments of the national Constitution
> have radically changed the basis of
> representation and provided for a redistribution
> of political power . . . . The census is our only
> constitutional means of determining the
> political or representative population. The
> [F]ourteenth [A]mendment has made that work
> a difficult one.  At the time of its adoption it was
> generally understood that the exclusion applied
> only to colored people who should be denied the
> ballot by the laws of their State.  But the
> language of the article excludes all who are
> denied the ballot on any and all grounds other
> than the two specified.  This has made it
> necessary to ascertain what are in fact the
> grounds of such exclusion . . . .

H.R. REP. NO. 41-3, at 52.  The Census Committee went on to
identify "nine general classes" of state constitutional
provisions and laws that impermissibly abridged or denied the
voting franchise on account of:  (1) race or color; (2) "residence
on lands of United States," "residence less than required time
in United States," "residence in State less than required time,"
and "residence in county, city, town, district"; (3) lack of
"property qualifications" or non-payment of taxes; (4) lack of
"literary qualifications"; (5) character or behavior; (6) army or
naval service; (7) "pauperism, idiocy, and insanity"; (8)
"[r]equiring certain oaths as preliminary to voting"; and (9)
other causes.  *Id.* at 52–53; *see id.* 71–93.  To capture a count
of the population subject to such laws, the Census Committee
recommended "add[ing] . . . a column for recording those who

5

are voters," and another for recording "Citizens of the United States, being twenty-one years of age, whose right to vote is denied or abridged on other grounds than rebellion or crime." *Id.* at 53.

At the outset, however, the Census Committee severely undermined its own proposal. After outlining its proposal for collecting population data on citizens whose right to vote had been denied or abridged, it asserted that, while this was "the best method that ha[d] been suggested," it might be "difficult to get true and accurate answers" to the relevant question because it would "allow the citizen to be a judge of the law as well as the fact." *Id.* The Commissioner of the Census, under direction of the Secretary of the Interior, nevertheless went ahead with changing the census schedule to incorporate the citizenship and suffrage questions. CONG. GLOBE, 42d Cong., 2d Sess. 79 (1872) ("[I]t was believed that . . . in order to carry out the requirements of the [F]ourteenth [A]mendment, the Department would not be clear if it neglected to make the attempt [to do so], it being the only executive organ through which, without such special provision, the information could be obtained . . . ."). To effectuate the collection of responses to these questions, the Secretary informed Assistant U.S. Marshals at the time, who were responsible for taking the census, that "[m]any persons never try to vote, and therefore do not know whether their right to vote is or is not abridged," but that the question was intended to capture "not only those whose votes have actually been challenged, and refused at the polls for some disability or want of qualification" but also "all who come within the scope of any State law denying or abridging suffrage to any class or individual on any other ground than participation in rebellion, or legal conviction of a crime." DEP'T OF INTERIOR, INSTRUCTIONS TO ASSISTANT MARSHALS (1870), https://usa.ipums.org/usa/voliii/inst1870.shtml [perma.cc/D49N-XUMS].

6

Despite these instructions, the positive response rate to the question on denial or abridgement was abysmally low.  Reports of voter disenfranchisement at the time were common.  *E.g.*, TESTIMONY TAKEN BY THE SUBCOMM. OF ELECTIONS IN LA., H.R. MISC. DOC. NO. 41-154, pt. 2, at 188 (2d Sess. 1869) ("It was remarked by [General A. L. Lee and Governor Warmoth] that the better course would be to advise the colored people not to vote [in the 1868 election].  This was done, and hence the small republican vote cast in [New Orleans] and in many of the parishes of the State.").  Yet, the Census Bureau reported that only 185 out of 159,037 male citizens over 21 in Louisiana— and only 40,380 out of 8,314,805 nationwide—had their right to vote abridged or denied.  CONG. GLOBE, 42d Cong., 2d Sess. 83 (1872).  This outcome led the Secretary himself to "give but little credit to the returns made by assistant marshals in regard to the denial or abridgement of suffrage."  CONG. GLOBE, 42 Cong., 2d Sess. 79.  Members of the House of Representatives derided the results as "utterly inaccurate" and "not reliable" given that they reported so few disenfranchised voters.  *Id*.  The Superintendent of the Ninth Census further undermined the 1870 Census results by echoing the Census Committee's prior lack of confidence, reporting that "[t]he census is not the proper agency for . . . . questions of citizenship and of the denial of suffrage to rightful citizens" because they are "mixed questions of law and fact, which an assistant marshal is not competent to decide."  FRANCIS A. WALKER, NINTH CENSUS – VOL. I, THE STATISTICS OF THE POPULATION OF THE UNITED STATES xxviii (1872).  Incredibly, however, the Superintendent went on to deem "[t]he count . . . of the total number of male citizens above twenty-one in each State in the United States" to have been "carefully made," to be "as exact as most statistical results," and to have had "an important bearing upon political philosophy and political history in the United States."  *Id.*

7

Based on these results, the representative population of the Southern states increased 13.92 percent. *Id.* at xiii. In the decade following, there were pervasive reports of voter disenfranchisement, but with the increase in political representation already in place, former slaveholding states received the same unwarranted political power the Reduction Clause was meant to prevent. *See* BENJAMIN GRIFFITH BRAWLEY, A SHORT HISTORY OF THE AMERICAN NEGRO 178 (Macmillan 1913) ("In the decade 1870-1880 intimidation; theft, suppression, or exchange of the ballot boxes; removal of the polls to unknown places; false certifications; and illegal arrests on the day before an election were the chief means used by the South to make the Negro vote of little effect."); PROCEEDINGS OF THE NATIONAL CONFERENCE OF COLORED MEN OF THE UNITED STATES, HELD IN THE STATE CAPITOL AT NASHVILLE, TENNESSEE, 1879 32 (Darby 1879) (reporting Colonel Robert Harlan's statement that "[a]t present there seems to be no alternative [but to migrate to the North]. The reaction has robbed Southern Republicans, both white and colored, of their votes and of their voices, and this has thrown the nation into the hands of our opponents, who are determined to strip us of the last measure of protection.").

## II.

To this day, the government has failed to enforce the Reduction Clause despite having codified it into law. *See* Act of Feb. 2, 1872, 17 Stat. 28–29 (1872) (codified at 2 U.S.C. § 6). While the Fifteenth Amendment invalidated *de jure* disenfranchisement based on race, states remained able through the Civil Rights Era to exercise *de facto* disenfranchisement and "eas[ily] . . . deny the franchise to persons on account of their race" through "poll tax[es], literacy test[s], and other similar qualifications imposed on the exercise of the franchise" without any proportionate reduction in their congressional

8

representation.  Bonfield, *supra*, at 108–09.  Indeed, "[B]lacks in the South," as well as other non-white groups, "were virtually disenfranchised from the end of the Reconstruction Period until 1965."  U.S. COMM'N ON C.R., THE VOTING RIGHTS ACT SUMMARY AND TEXT 4 (1971).  The Reduction Clause was essentially a dead letter, and it had no deterrent effect on these overt measures to disenfranchise Black citizens.

This occurred notwithstanding the intermittent but courageous efforts of a small number of congresspeople to jumpstart the Executive Branch's failed enforcement of the Reduction Clause.  In 1901, prior to the apportionment pursuant to the Twelfth Census, Representative Shattuc of Ohio introduced a resolution that would have directed the "Director of the Census" to furnish the House of Representatives with information regarding the denial or abridgement of suffrage on account of illiteracy, "pauperism," polygamy, "property qualifications, or for any other reason." Zuckerman, *supra*, at 117 (quoting 34 CONG. REC. 556 (1901)). That resolution died in committee.  *Id.* at 118.  In 1904, Senator Platt of New York introduced a bill to amend Congress's 1901 Apportionment Act to acknowledge that "the right . . . to vote at some . . . elections since [1901] . . . has in fact been denied or abridged for causes not permitted by the Constitution," and to reduce the representation of several Southern states. Zuckerman, *supra*, at 119 (quoting S. 5747, 58th Cong. (3d Sess. 1904–1905)).  That bill also died in committee.  *Id.*  In 1906, Representative Keifer of Ohio went further than anyone else had gone so far, introducing a bill to reduce the number of representatives of Southern states by 37—the number proportionate to the entire Black population in the South, which Keifer asserted was completely disenfranchised by "the use of fraudulent ballots, shotgun policies, dishonest registration policies, and intimidation at the polls."  *Id.* at 120 (quoting 40 CONG. REC. 3885–86 (1905–1906)); *see id.* at 119–20.

9

Keifer's bill, similarly, died in committee. *Id.* at 120. Over fifty years later, in 1957, Senator McNamara of Michigan proposed an amendment to the bill that would ultimately become the Civil Rights Act of 1957, which detailed a plan for implementing the Reduction Clause through a joint committee that would have been responsible for identifying states that deny or abridge the right to suffrage and calculating the proportionate reduction in representation due to those states. *Id.* at 120–21. McNamara's proposal was rejected; he then reformulated the proposal into a standalone bill that—you guessed it—also died in committee. *Id.* at 121 (citing S. 2709, 85th Cong. (1st Sess. 1957)); 103 CONG. REC. 13703 (1957)).

Individuals have also sought to enforce the Reduction Clause's representation penalty through judicial action, albeit unsuccessfully. In *Saunders v. Wilkins*, Saunders, a prospective candidate for the House of Representatives in Virginia, sued the Secretary of the Commonwealth of Virginia over the latter's refusal to certify Saunders as a candidate despite his submission of a petition signed by 250 qualified voters. 152 F.2d 235, 235 (4th Cir. 1945), *cert. denied*, 328 U.S. 870 (1946). Saunders theorized that the Secretary's actions abridged the right "to vote for the choice of . . . Representatives in Congress" and that Congress's 1941 reapportionment, which did not reduce Virginia's representation proportionately, was invalid as a violation of the Reduction Clause. *Id.* at 236. The Fourth Circuit interpreted the "underlying purpose" of Saunders's Reduction Clause argument to be "abolition of the Virginia poll tax law," but then punted, finding that the question of whether the poll tax fell within the terms of the Reduction Clause was "a question political in its nature which must be determined by the legislative branch of the government and is not justiciable." *Id.* at 237. In another case, *Lampkin v. Connor*, this Court affirmed the dismissal of a complaint filed against the

10

Secretary of Commerce by voters seeking to enforce the Reduction Clause. 360 F.2d 505, 506 (D.C. Cir. 1966). Plaintiffs in that case fell into two categories—one group alleged potential vote dilution injury if the then-upcoming 1970 Census failed to implement the Reduction Clause and the other group alleged that they would be injured from the obstruction of their right to vote by state poll taxes and certain registration requirements.[1] *Id.* 506, 510. Our Court determined the first group's injury, alone, was too speculative to warrant adjudication and that adjudicating the claims of either group, in light of the Voting Rights Act of 1965 and the Twenty-Fourth Amendment to the Constitution banning poll taxes, would be "premature" unless "it c[ould] fairly be said that discrimination persists despite th[o]se new measures." *Id.* at 511. Nevertheless, this Court also made sure to say that, even though plaintiffs' timing might have rendered their complaint "unsuitable for judicial disposition at [the] time," it was also "premature to conclude that Section 2 of the Fourteenth Amendment does not mean what it appears to say." *Id.* at 512.

Despite these enforcement efforts and ongoing evidence of voter disenfranchisement, neither the Bureau nor any other member of the Executive Branch appears to have meaningfully attempted to figure out how to implement this constitutional

---

[1] Notably, the *Lampkin* plaintiffs were represented by then-attorney William B. Bryant in their district court challenge, *Lampkin v. Connor*, 239 F. Supp. 757 (D.D.C. 1965), who, mere months after the case was decided, was appointed to serve as a judge on the U.S. District Court for the District of Columbia and later served as the first Black Chief Judge for that court. *William B. Bryant*, Hist. Soc'y D.C. Cir., https://dcchs.org/judges/bryant-william/ [perma.cc/5ZSR-DZSD]; *William B. Bryant Annex History*, U.S. Gen. Servs. Admin., https://www.gsa.gov/real-estate/gsa-properties/visiting-public-buildings/william-b-bryant-annex/whats-inside/history (Jan. 21, 2024) [perma.cc/836T-ASG8].

11

provision.  It is as if the Reduction Clause were written in invisible, rather than indelible, ink.  Its sister provisions in the Fourteenth Amendment are summarily lauded—failure to enforce them causes hand wringing and outcry—and yet the abandonment of the Reduction Clause has been met with a shrug.

## III.

Part of the Bureau's defense that it does not have the authority to implement the Reduction Clause is that, by statute, the Secretary is not "directed" to "report population counts that are less than the 'total population.'"  Appellee's Br. 11.  To be sure, 13 U.S.C. § 141 provides that the Secretary "shall . . . every 10 years . . . take a decennial census of population as of the first day of April of such year . . . in such form and content as [s]he may determine" and "report[]" the "tabulation of total population by States . . . as required for the apportionment of Representatives in Congress among the several States . . . within 9 months after the census date . . . to the President of the United States."  The Report delivered to President Biden in 2020, however, betrays the Bureau's argument in that it specifically calculated the "number of apportioned representatives based on [the] 2020 Census" according to the method of equal proportions as provided for in 2 U.S.C. §§ 2a, 2b.  A. 55 & n.2.

The Bureau cannot have it both ways.  Contrary to the Bureau's representation at oral argument—that the Bureau only "count[s] the total number of people in the United States" and nothing else, Oral Argument Tr. 28—the Bureau demonstrates that it has the authority to provide the President with an apportionment count based on census data.  It is thus the Bureau's responsibility to ensure that the apportionment

12

count it is providing accords with the Reduction Clause as well as the Clause's statutory codification at 2 U.S.C. § 6.

The Bureau made a slapdash, one-time attempt to effectuate the Reduction Clause in 1870, but that failed attempt cannot now justify the agency's ongoing failure to even try to ensure that states denying or abridging the right to vote are appropriately held to account. *See* Oral Argument Tr. 27. The census remains the most natural established way of ascertaining the data necessary to effectuate the Reduction Clause, as both the House and Senate recognized in the late 1860s. *See* Zuckerman, *supra*, 107–08. The Bureau has several tools at its disposal to identify ways to implement the provision; it can promulgate rules, engage in notice and comment, seek out implementation input from experts, or generate reports for submission to the President and Congress. I concede that implementing the Reduction Clause might be difficult, but that is no excuse for the Executive Branch to abdicate its responsibility to give effect to this important part of the Constitution. Many constitutional provisions are difficult to enforce, like the Second Amendment, the preservation of the right to trial by jury, and the guarantee of equal protection. But the government has a duty to enforce all of the Constitution, not just some of it, and it is time that the government stop treating the Reduction Clause as an afterthought. *Cf. Nebraska v. Wyoming*, 325 U.S. 589, 616 (1945) ("The difficulties of drafting and enforcing a decree are no justification for us to refuse to perform the important function entrusted to us by the Constitution."); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 691 (1977) ("[T]he prospect of additional administrative inconvenience has not been thought to justify invasion of fundamental constitutional rights.").